UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FISCHER CROSSINGS DEVELOPMENT | ) | Case No. 08-12904-whd |
| GROUP, LLC, | ) | |
| | ) | |
| Debtor. | ) | JUDGE DRAKE |

## MOTION FOR ORDER APPROVING SALE OF REAL PROPERTY AND SEWER CAPACITY

COMES NOW Fischer Crossings Development Group, LLC, the debtor and debtor in possession in the above-captioned case (the "Debtor"), and hereby moves (the "Motion") this Court for entry of an order pursuant to Sections 105(a) and 363 of Title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the sale of approximately 6.90 acres of unimproved real property ("Property") owned by the Debtor in Coweta County, Georgia as well as sewer capacity at the rate of $15 per gallon to Owosso 3 Cinemas, Inc. ("Buyer"), for a purchase price of $3,500,000  pursuant to a "Real Estate Purchase Agreement" ("Contract") a copy of which is attached hereto as **Exhibit "A"**.  The Debtor also requests that the Court make any order approving the sale immediately final as provided for in Bankr. R. 6004(h).

In support of this Motion, the Debtor represents as follows:

## BACKGROUND

1.     On May 27, 2009, (the "Petition Date"), this Court adjudicated Fischer Crossings Development Group, LLC a bankrupt and entered an order for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, modified, or supplemented, the "Bankruptcy Code").

2.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The Debtor is a Georgia limited liability company which currently owns approximately 91.1 acres[1] of unimproved real property located in unincorporated Coweta County, Georgia along Highway 34 near the Fayette-Coweta County border.

4.     The Property which is the subject matter of this Motion consists of approximately 6.90 acres of unimproved real property located at the intersection of Highway 34 and Fischer Road in unincorporated Coweta County.  Bank of Coweta ("BOC") holds a first in priority security deed and lien encumbering approximately 88 acres of unimproved real property, including the Property, owned by the Debtor in Coweta County to secure a debt in the original principal amount of $11,050,000. This loan has a current outstanding principal balance of approximately $7,550,000.

5.    The Property is also encumbered by a second in priority deed to secure debt held by Fischer Road Mezzanine Loan, LLC ("Fischer Mezzanine") in the original principal amount of $1,200,000 and a disputed mechanics and materialmen lien held by Richard Harp Excavation, Inc. in the amount of $2,461,000.  Real property ad valorem taxes for tax years 2007, 2008 and 2009 are outstanding in the approximate amount of $100,000.

<u>RELIEF REQUESTED</u>

6.    The Debtor seeks authority to sell the Property to the Buyer, Owosso 3 Cinemas, Inc., pursuant to the Contract for a price of $3,500,000 to be paid all in cash at closing subject to prorations.  The Buyer is an unaffiliated third party which negotiated the Contract on an arm's length basis.  The sale of the Property is "AS IS WHERE IS" and shall be free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. § 363.  The Debtor further seeks authorization to make disbursements and execute and deliver all necessary deeds, affidavits, certificates and other closing documents necessary to consummate the sale.

7.    In addition to customary prorations, the Debtor seeks authority to make the following disbursements at closing:

---

[1] This Court previously approved the sale of 17.92 acres of the original 109 acres owned by the Debtor on the petition Date.

- An estimated amount of $300,000 to pay past due 2007, 2008 and 2009 real property ad valorem taxes. The disbursement will be the actual amount due for 2007, 2008 and 2009;

- $14,000 for United States Trustee fees which may be due because of the sale,

- $6,700 for payment of transfer tax on the sale;

- An amount up to $15,000 for closing prorations, miscellaneous items, and other unbudgeted closing expenses;

- $50,000 to be retained by the Debtor as working capital and to pay administrative expense;

- $75,000 to establish retainers for the Debtor's professionals in this case;

- $237,300 to establish a retainer for LAI Engineering to perform site design services as defined in Exhibit "C" to the Contract;

- Real estate commissions of (a) $80,000 to Colliers Spectrum Cauble Realty LLC and (b) $80,000 to CB Richard Ellis, Inc.;

- A reserve of $1,400,000 to pay for the Seller's work as defined in Section 30.4. of the Contract.

- The balance estimated to be approximately $1,442,000 to Bank of Coweta.

8.     The foregoing amounts are the Debtor's best estimates of the amount of funds necessary to be disbursed and may vary depending on actual amounts

computed as of the closing date.  These expenses are necessary to be paid in order
to consummate the sale and enable the Debtor to continue operating as a debtor in
possession, reorganize and liquidate its remaining property and repay all creditors.

## PROPOSED SALE OF THE PROPERTY

9.    The Debtor has entered into a Contract which provides for the sale of
the Property to the Buyer.

10.    The pertinent terms of the Contract and the resulting transaction are
summarized as follows:

- Payment by the Buyer of $3,500,000 in good funds at closing subject to prorations;

- Closing to occur not later than May 15, 2010; and

- Disbursements at closing to lienholders and essential professionals for future work related to the Property and the remaining collateral of the lienholders.

- Creation of necessary reserves to enable the Debtor to reorganize and to consummate the Contract.

- Performance by the Debtor of certain site work and improvements for the Property which will also benefit the remaining property owned by the Debtor.

- Sale of sewer capacity controlled by the Debtor at the rate of $15 per gallon.

11.    Pursuant to Bankruptcy Rule 2002(a)(2) and (c), the Debtor is
required to notify, *inter alia,* the Debtors' creditors of a proposed sale of the assets

outside of the ordinary course of business. This Motion and an accompanying Notice of Hearing will be served on all creditors of the Debtor.

12.    The sale will substantially enhance the value of the Debtor's other real estate holdings in the area by not only providing a comparable for valuation purposes, but also by continuing the ongoing development of the site. All of the Debtor's secured creditors will see their equity cushions increase with the consummation of this sale and the likelihood of full repayment to unsecured creditors through a successful reorganization will be vastly enhanced.

## AUTHORITY

13.    Courts afford a debtor substantial deference in formulating procedures for selling assets. See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

14.    The paramount goal for any proposed sale of the property of a bankruptcy estate is to maximize the proceeds received by the estate. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 B.R. 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of

bankruptcy sales and the Debtors' duty with respect to such sales is to obtain the highest price or overall greatest benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

15.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  A debtor in possession is given these rights by Section 1107(a) of the Bankruptcy Code.    Moreover, Section 105(a) of the Bankruptcy Code provides that the bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

16.    The proposed use, sale, or lease of property of the estate may be approved under Bankruptcy Code Section 363(b) if it is supported by sound business justification.  See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983).  Accord Stephens Indus. V. McClung, 789 F.2d 386, 389-90 (6th Cir. 1986).  Moreover, pursuant to Section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interests of preserving or protecting the value of a debtor's assets, see, e.g., In re Chinichian, 784 F. 2d 1440, 1443 (9th Cir. 1986), such as structuring an orderly sale process.

17.    Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel Corp., 822 F.2d at 1071.

18.    As set forth in this Motion, the Debtors believe that good cause exists to authorize the sale of the Property on the terms prayed for in this Motion.

19.    Pursuant to the Bankruptcy Rule 6004 and Section 363(f), the sale of the Property to the Buyer will be free and clear of all liens, claims, interests and encumbrances and sold "AS IS" "WHERE IS" with a full disclaimer of any warranties. The Debtors propose that the liens of BOC and Fischer Mezzanine, both pre petition and post petition, and the liens, if any, of any taxing authority or other lienholders attach to the proceeds of the transaction received by the Debtor, with the same priority and validity that such liens existed on the Property in accordance with Section 363(f) and that the Debtor be permitted to make disbursements to them at closing along with the other proposed disbursements.

## NOTICE

20.    Notice of this Motion will be given in accordance with Bankr.R. 2002.

WHEREFORE, the Debtor requests that the Court enter an Order approving the sale of the Property and sewer capacity to Ossowo 3 Cinemas, Inc. pursuant to the Contract attached hereto as **Exhibit "A"** , free and clear of liens, claims and encumbrances,  granting the Debtors authority to execute and deliver any and all closing documents, deeds, affidavits, closing statements, resolutions as may be necessary to consummate the sale of the Property, to make the disbursements set forth in this Motion, and that this Court make the order approving this sale final upon entry as provided for in Bankr. R. 6004(h).

This 28th day of January, 2010.

\s\ John A. Christy
JOHN A. CHRISTY
Georgia Bar No. 125518
J. CAROLE THOMPSON HORD
Georgia Bar No. 291473

Attorneys for Debtor

SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
Telephone: (404) 681-3450
Facsimile: (404) 681-1046

# *REAL ESTATE PURCHASE AGREEMENT*

THIS **REAL ESTATE PURCHASE AGREEMENT** (this **"Agreement"**) is made and entered into as of the 5Th day of January, 2010, by and between **OWOSSO 3 CINEMAS, INC.** (**"PURCHASER"**), **FISCHER CROSSINGS DEVELOPMENT GROUP, LLC** (**"SELLER"**), **CB RICHARD ELLIS, INC.** (**"SELLER'S BROKER"**) and **COLLIERS SPECTRUM CAUBLE REALTY, LLC** (**"PURCHASER'S BROKER"**).

### WITNESSETH

For and in consideration of the mutual covenants, promises, and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby covenant and agree as follows:

1.   **SALE OF PROPERTY.**

      **1.1**    Upon the terms and conditions provided herein, Seller will sell to Purchaser and Purchaser will purchase from Seller that certain real property located at the northeast corner of the intersection of Georgia Highway 34 and Fischer Road, Coweta County, Georgia, being approximately seven (7) acres, as more particularly depicted on the site plan (the **"Preliminary Site Plan"**) and attached hereto as **Exhibit "A"** and by this reference incorporated herein, together with, but in all events subject to and as limited and restricted by any and all limitations, restrictions, requirements, conditions, obligations, allocations, rights, capacities and other matters set forth in any and all of the Title Matters (as hereinafter defined), all improvements and fixtures thereon, all rights, privileges, easements (including access easements, and assignable permits, development rights and utility rights as and to the extent expressly provided herein for an approximately 45,000 sq. foot commercial movie theater and a parking lot consisting of approximately 500 standard-sized stalls on the Property, provided that the number of parking spaces may be adjusted to comply with, and in no event shall exceed the maximum number of parking spaces allowed under, applicable laws, rules, regulations, orders, ordinances, approvals or permits) and appurtenances thereunto belonging, and all of Seller's right, title and interest in and to all roads, improvements and driveways, if any, located on said real property and belonging to Seller, all excepting, reserving and subject to, however, all rights of any "declarant" or similar rights under, and all rights and easements appurtenant to or otherwise benefitting the Adjoining Property (as hereinafter defined) under, any and all of the Operating Agreements (as hereinafter defined) (collectively, the **"Property"**).

      **1.2**    Notwithstanding anything to the contrary contained in this Agreement, Purchaser hereby acknowledges that (a) as of the Effective Date the Property is a part of a larger parcel of land (such larger parcel, including the Property, the **"Overall Property"**), and (b) Seller is retaining all of the Overall Property, less and excepting therefrom the Property, and certain other real property owned by Seller which may, in Seller's sole and absolute discretion, be and constitute part of the Center (as herein defined), all such property retained and owned by Seller being more particularly described on **Exhibit "B"** attached hereto and by this reference incorporated herein (together with any and all right, title and interest of Seller in and to the land and bed underlying the current location of Wynn's Pond Road now existing or hereafter created by or resulting from any relocation or abandonment of the current Wynn's Pond Road, the **"Adjoining Property"**). Purchaser further acknowledges that the Adjoining Property and the Property, or certain portions thereof, are currently undergoing development planning to be developed as a shopping center (the

**Exhibit A**

"**Center**") known as "Fischer Crossings" or such other name as Seller selects in its sole and absolute discretion. In order to accommodate the future development of the Adjoining Property, or portions thereof, Seller may desire to modify certain provisions of the Title Matters or the Operating Agreements, or to encumber either or both of the Property or the Adjoining Property, or certain portions of either of them, with additional easements, covenants or restrictions. Seller hereby expressly reserves, and Purchaser hereby expressly agrees that Seller shall have, the right to amend, modify or supplement the Operating Agreements and otherwise to impose additional easements, covenants and restrictions on the title to either or both of the Property or the Adjoining Property, or any portion of either of them, and the right to modify the boundaries of the Property or grant temporary or permanent easements encumbering the Property in order to accommodate any requirements of the Georgia Department of Transportation, Coweta County, Georgia (the "**County**") or other applicable public jurisdiction in connection with the permitting, construction or dedication of any improvements constructed or to-be-constructed on either or both of the Property or the Adjoining Property or any portions of either of them; provided, however, that Purchaser shall retain the right under Paragraph 10 hereof to object to any such matters that affect the condition of title to the Property. The provisions of Paragraph 10 hereof shall apply with respect to any such objection, except that Seller shall not be deemed to have breached this Paragraph 1 as a result of any exercise of Seller's rights reserved in the immediately preceding sentence, and Seller shall not be obligated to cure any such matters to which Purchaser timely objects. All matters encumbering title to the Property that are permitted under this Paragraph 1.2 and to which Purchaser does not object, or to which Purchaser objects but subsequently waives its objection, shall be deemed "Permitted Exceptions" (as hereinafter defined) for all purposes of this Agreement. If Seller effects any modification of the boundaries of the Property permitted under this Paragraph 1.2 and to which Purchaser does not object, or to which Purchaser objects but subsequently waives its objection, then the boundaries of the Property, as so modified, shall, without any further action of the parties hereto, shall be and constitute the "Property" for all purposes of this Agreement.

      **1.3**    Purchaser further acknowledges that Seller is subdividing and developing the Property and the Adjoining Property into a commercial development. Purchaser agrees that it is in Purchaser's best interest to have Seller negotiate with applicable parties, on behalf of Purchaser and any lot owners within such development, for any and all curb cuts onto dedicated roads and streets within or adjoining such development. Purchaser hereby agrees that at the Closing Seller shall retain the right to negotiate such rights as the same pertain to the Property and that Purchaser shall not undertake such negotiation, provided that Seller shall not reduce the number of curb cuts directly (or indirectly through easement rights) serving the Property to less than one (1) curb cut. Purchaser hereby further grants Seller the right, to and on behalf of Purchaser, to modify from time to time the boundaries of the Property or grant temporary or permanent easements encumbering the Property in order to accommodate any requirements of the Georgia Department of Transportation, the County or other applicable public jurisdictions in connection with the permitting, construction or dedication of any improvements constructed or to-be-constructed on either or both of the Property or the Adjoining Property or any portions of either of them. The provisions of this Paragraph 1.3 shall survive the Closing and delivery of the limited warranty deed required hereunder, and Purchaser further agrees to execute and deliver any documentation reasonably requested by Seller following the Closing to evidence such rights to Seller, and to otherwise fully cooperate with Seller in the negotiation of such curb cuts and improvements.

                                                  

**1.4**     Notwithstanding anything to the contrary contained in Paragraphs 1.2-1.3, no exercise by Seller of the rights or powers granted to or retained by Seller therein shall materially interfere with Purchaser's operation of the Property for Purchaser's intended use thereof as described herein, or materially adversely affect the footprint of the building improvements Purchaser intends to construct on the Property as described herein. The provisions of this Paragraph 1.4 shall survive the Closing and delivery of the limited warranty deed required hereunder.

**2.     PURCHASE PRICE.**     Subject to adjustment as provided in Paragraph 30.4(c) hereof and otherwise as expressly provided in this Agreement, the purchase price to Seller shall be **THREE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($3,500,000.00)** (as the same may be adjusted from time to time, the **"Purchase Price"**). The balance of the Purchase Price not paid as "Earnest Money" (as defined in Paragraph 6, below) shall be, except as and to the extent expressly set forth herein to the contrary, paid by cash or wire transfer of good and available federal funds at the Closing of this purchase and sale.

**3.     INSPECTION.**

**3.1**     During the period commencing as of the "Effective Date" (as defined in Paragraph 25, below) and ending at 6:00 p.m. Atlanta, Georgia time on the date that is forty-five (45) days after the Effective Date (said period being hereinafter referred to as the **"Inspection Period"**), Purchaser's agents, employees, and independent contractors shall have the right to conduct, at Purchaser's sole expense, such physical, engineering, environmental, soils, borings, geotechnical and feasibility studies and such other tests, analyses and investigations as Purchaser deems appropriate in an effort to determine whether or not to proceed with the closing of this transaction. During the Inspection Period and thereafter until Closing or other termination of this Agreement, Purchaser, Purchaser's agents, employees and independent contractors shall continue to have the right to come onto the Property for the purpose of conducting the foregoing studies. Any inspection, examination, or test shall not interfere with Seller's use of the Property or any work lawfully being performed on the Property and shall not violate any law or regulation of any governmental entity having jurisdiction over the Property. Upon the completion of any inspection, examination, or test, Purchaser shall repair any damage to the Property. Purchaser agrees to indemnify and hold Seller harmless from any and all loss and expense (including, without limitation, attorneys' fees) resulting from claims or damages caused by, arising out of, or incurred in connection with the exercise by Purchaser, or by anyone claiming by, through or under Purchaser, of Purchaser's rights under this Paragraph, other than any claims or damages arising out of the non-negligent release of any "Hazardous Materials" (hereinafter defined) not introduced onto the Property by Purchaser, its agents, employees or contractors. The foregoing indemnity shall expressly survive any expiration or earlier termination of this Agreement and the Closing of the transactions contemplated hereby. If, for any reason, in Purchaser's sole discretion, Purchaser considers the Property to be unsuitable for Purchaser's intended use, Purchaser may terminate this Agreement by delivering written notice to Seller prior to the expiration of the Inspection Period, in which event this Agreement shall terminate, the Remaining Earnest Money (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) attributable to this Agreement shall be promptly (and in any event within five (5) business days) refunded to Purchaser, and the parties shall be relieved of all liability and obligations hereunder, other than

1316844_6

Purchase Agreement-V.2

with respect to obligations that survive any termination of this Agreement by the express terms hereof.

**3.2**     Seller shall have no obligation to obtain, or to provide or deliver to Purchaser, any due diligence materials with respect to the Property or the Adjoining Property, including, without limitation, any property tax assessments or bills, surveys, title policies, easements, utility information, environmental assessments, reports or audits, zoning letters or other similar matters.

**3.3**     Notwithstanding the foregoing, no later than fifteen (15) days prior to the expiration of the Inspection Period, Seller shall deliver to Purchaser for Purchaser's review, drafts of the Operating Agreements (as hereinafter defined).  Purchaser shall deliver to Seller Purchaser's comments, if any, to the Operating Agreements within five (5) days after Purchaser's receipt of such drafts.  If Purchaser fails to deliver any comments within such five (5) day period, Purchaser shall be deemed to have approved the forms of the Operating Agreements originally delivered to Purchaser.  If Purchaser delivers timely any comments to the Operating Agreements, Seller shall review such comments and determine, in its sole and absolute discretion, prior to Closing whether to incorporate and make such changes to the Operating Agreements.

**3.4**     Purchaser shall use good faith efforts to pursue and obtain prior to the expiration of the Inspection Period a commitment (the **"Loan Commitment"**) from a third-party lender reasonably acceptable to Seller (**"Lender"**) to fund an amount sufficient to enable Purchaser to (a) purchase the Property and to perform Purchaser's other duties and obligations under this Agreement, and (b) construct, equip and furnish on the Property an approximately 45,000 square foot movie theater and other improvements required for Seller's intended use of the Property, all in accordance with the terms and conditions of this Agreement.  If Purchaser fails to obtain the Loan Commitment in accordance with this paragraph, Seller may elect to terminate this Agreement by delivering written notice to Purchaser, in which event this Agreement shall terminate, the Remaining Earnest Money (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) attributable to this Agreement shall be promptly (and in any event within five (5) business days) refunded to Purchaser, and the parties shall be relieved of all liability and obligations hereunder, other than with respect to obligations that survive any termination of this Agreement by the express terms hereof.

**3.5**     Prior to the expiration of the Inspection Period, Seller and Purchaser shall cooperate in good faith to approve, and shall use commercially reasonable good faith efforts to obtain the approval by any applicable private, governmental or quasi-governmental party, agency, entity or body having jurisdiction over the Property or review or approval rights related to, or as may be necessary or advisable in Seller's reasonable discretion in connection with, the zoning, use, construction or development of or on the Property or any portion thereof (each, an **"Approval Party"** and collectively, the **"Approval Parties"**), a site design and development plan showing the improvements to be constructed, installed or developed on the Property, the configuration and layout thereof and other related matters (as so approved by the Approval Parties, the **"Site Plan"**), a tree protection plan and a grading plan for the Property pursuant to and in strict accordance with the Site Plan (collectively, the **"Grading Plans"**), any drawings, plans, specifications, designs and similar matters produced in connection with or pursuant to the Engineering Agreement, and all other drawings and plans and specifications of any type which, in the sole opinion of Seller, are necessary to enable Seller to perform the Seller's Work (as herein defined) (together with the Grading Plans, and as approved by the Approval Parties, collectively, the **"Approved Plans"**), and

4

shall each execute and deliver such applications, requests, certifications, submittals, agreements and other documents as may be reasonably necessary or required in order to obtain such third-party approvals. If any of the Approved Plans are not obtained in accordance with this paragraph, either Seller or Purchaser may elect to terminate this Agreement by delivering to the other party hereto written notice of such election, in which event this Agreement shall terminate, the Remaining Earnest Money (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) attributable to this Agreement shall be promptly (and in any event within five (5) business days) refunded to Purchaser, and the parties shall be relieved of all liability and obligations hereunder, other than with respect to obligations that survive any termination of this Agreement by the express terms hereof.

4.    **SURVEY.** A survey of the Property shall be prepared by the Engineer (as hereinafter defined) as part of the Site Design Services (as hereinafter defined) and certified to both Purchaser and Seller as meeting or exceeding the minimum requirements of Georgia law. After the survey shall have been prepared and approved by Seller (which approval will not be unreasonably withheld), **Exhibit "A"** attached hereto shall be supplemented by a new **Exhibit "A-1"** containing a legal description of the Property based upon the survey and, thereafter, such new legal description shall be the legal description of the Property for all purposes relating to this Agreement.

5.    **SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS.** As of the date of this Agreement and as of the date of Closing (other than with respect to matters (x) occurring after the date hereof that are outside the reasonable control of Seller, or (y) of which Seller notifies Purchaser in writing), Seller represents, warrants and covenants to Purchaser as follows:

5.1    Seller owns fee simple title to the Property, subject, however, to the Permitted Exceptions (as hereinafter defined), and Seller's execution, delivery, and/or performance of this Agreement will not require the approval or consent of any third party other than the Bankruptcy Approval (as defined hereinafter) and is not prohibited by and will not contravene or constitute a default under any statute, regulation binding on Seller or other law or other agreement, covenant, document, or instrument to which Seller is a party if Bankruptcy Approval is obtained. This Section 5.1 shall expire at Closing.

5.2    Seller is in open, notorious, and undisputed possession of the Property and there are no other parties in possession of or holding any right to use or possess any portion of the Property other than: (i) all matters of record, (ii) matters which would be shown on a current, true and accurate survey or inspection of the Property, (iii) the terms, conditions and requirements of any Development of Regional Impact approval or study by the Georgia Regional Transportation Authority (collectively, the **"DRI"**), (iv) the Operating Agreements, and (v) that certain Development Agreement dated May 20, 2008 among Coweta County, Georgia (**"County"**) and Seller (all matters set forth in the foregoing clauses (i)-(v), inclusive, are sometimes referred to herein collectively as the **"Title Matters"**). This Section 5.2 shall expire at Closing.

5.3    No person, firm, or entity has any right in or right to acquire the Property or any part thereof, and there is no contract (including any service contract) or agreement of any

Purchase Agreement-V.2

kind or nature affecting the Property or the operation thereof which will survive the Closing other than (or as shown in, on or by) the Title Matters. This Section 5.3 shall expire at Closing.

5.4     From the date of this Agreement until Closing, other than as previously authorized pursuant to the Title Matters, Seller shall not commit any waste or material change in the condition of the Property without the express written consent of Purchaser, which consent may be withheld in the reasonable discretion of Purchaser, except as expressly required or permitted herein.

5.5     Seller has never utilized the Property, nor, to Seller's current, actual knowledge without investigation, knowingly allowed use of the Property as a storage or dump site for chemical, biological, radioactive, industrial processing or other waste material and has no actual knowledge (without investigation) of the use of the Property as such dump or storage site. To Seller's current, actual knowledge without investigation, no Hazardous Materials at levels in violation of applicable law or underground storage tanks have been or are contained in, treated, stored, handled or located on, discharged from, or disposed of on, or constitute a part of, the Property in violation of applicable law. As used herein, the term **"Hazardous Materials"** includes without limitation, any asbestos, polychlorinated biphenyls, petroleum or petroleum products, urea formaldehyde foam insulation, flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, or related or unrelated substances or materials defined, regulated, controlled, limited or prohibited in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act (RCRA), as amended (42 U.S.C. Sections 6901, *et seq.*), the Clean Water Act, as amended (33 U.S.C. Sections 1251, *et seq.*), the Clean Air Act, as amended (42 U.S.C. Sections 7401, *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. Sections 2601, *et seq.*), and in the rules and regulations adopted and publications promulgated pursuant thereto, and in the rules and regulations of the Occupational Safety and Health Administration (OSHA) pertaining to occupational exposure to asbestos, as amended, or in any other federal, state or local environmental statute, regulation or other law now in effect. All representations and warranties in this Section 5.5 are qualified and supplemented by any information, if any, contained in any environmental report Seller has delivered to Purchaser previously or delivers within ten (10) days after the Effective Date, or in any environmental report Purchaser obtained regarding the Property prior to the date of this Agreement. For purposes of this Agreement, the phrases "Seller's knowledge," "to Seller's knowledge" or words of similar import shall mean the current, actual knowledge of Scott Seymour without any duty to investigate or having made any investigation.

5.6     Seller has not received written notice of any uncured violations of any statute, regulation or other law affecting any portion of the Property, and Seller shall give to Purchaser prompt notice of, any written notice of any such violation received prior to Closing, including without limitation, any environmental or land use statute, regulation or other law applicable to the Property. All representations and warranties in this Section 5.6 are qualified and supplemented by any information, if any, contained in any environmental report Seller has delivered to Purchaser previously or delivers within ten (10) days after the Effective Date, or in any environmental report Purchaser obtained regarding the Property prior to the date of this Agreement. Except as disclosed in the Title Matters, Seller has received no written notice of any proposed or pending public improvements or any pending or contemplated condemnation proceedings affecting the Property.

6

**5.7**    Seller has filed for bankruptcy or reorganization.  Other than the Chapter 11 case styled In re: Fischer Crossings Development Group, LLC, as debtor, Case No 08-12904, United States Bankruptcy Court, Northern District of Georgia ("**Bankruptcy Court**"), no litigation is pending, nor has Seller received written threat of any lawsuit, with respect to the Property which would inhibit Purchaser obtaining clear title to the Property.

**5.8**    If the Closing occurs, Seller hereby agrees to indemnify, hold harmless and defend Purchaser from all loss, cost, damage, claim and expense actually incurred by Purchaser on account of (i) the material violation of or material inaccuracy in any representation, warranty or covenant set forth in this Paragraph 5, and (ii) Seller's failure to perform any obligations of this Paragraph 5, but the total amount recoverable by Purchaser for all such breaches of Paragraph 5 combined shall not exceed the total amount of Earnest Money deposited by Purchaser as of the date of such breach, and Seller shall have no liability to Purchaser therefor unless the aggregate liability exceeds $25,000.  This indemnification and (except as otherwise expressly provided above) the provisions of this Paragraph 5 shall survive the Closing of the sale and the delivery of the deed for six (6) months after the Closing date, at which time they shall be null and void.

**6.**    **SITE DESIGN WORK AND EARNEST MONEY.**

**6.1**    Seller shall cause to be performed as part of Seller's Work (as hereinafter defined), those certain engineering and site design services that are directly applicable to the Property (collectively, the **"Site Design Services"**) as set forth in and in accordance with that certain Proposal from LAI Engineering (the **"Engineer"**) to Scott Seymour dated December 9, 2009 (a copy of which is attached hereto as Exhibit "C" and incorporated herein by this reference) (the **"Engineering Agreement"**).  Notwithstanding anything to the contrary contained herein, including, without limitation, Paragraph 30.4 hereof, Seller shall (a) at all times and from time to time after the Effective Date and through Closing be entitled to draw upon and have disbursed from the Earnest Money (as hereinafter defined) any amount(s) necessary to pay for or reimburse Seller for the Site Design Services or any other portion of Seller's Work commenced prior to Closing (provided that if Closing occurs, Purchaser shall in all events be entitled to a credit at Closing against the Purchase Price in the amount of the Earnest Money), and (b) not be obligated, prior to Closing, to perform or cause to be performed any Site Design Services or other portions of Seller's Work (i) the total cost of which would exceed the total Earnest Money, or (ii) the cost of any one or more portions or components of which would exceed the Earnest Money then on deposit with Agent (as hereinafter defined).

(a)    Pursuant to the foregoing, Seller may withdraw from time to time such portion of the Earnest Money necessary to pay or reimburse Seller for all or any portion of the Site Design Services or other portions of Seller's Work commenced prior to Closing that have been performed and have not previously been disbursed to Seller by giving a disbursement notice (a **"Disbursement Notice"**) to Purchaser and to Agent of the occurrence and amount of such disbursement to be released to Seller.  Any such Disbursement Notice shall bear the heading "DISBURSEMENT REQUEST - THIS DEMANDS IMMEDIATE ATTENTION" in all capital letters and in a bolded font specifying, in reasonable detail, Seller's reasons for such disbursement, and enclosing a copy of the subject invoice(s) therefor received by Seller (each, a **"Pay Application"**).  Purchaser shall have five (5) business days after receipt thereof to object to such Disbursement Notice by written notice to Seller and Escrow Agent (an **"Objection Notice"**),

7

which objection shall be solely on the grounds that the work for which Seller seeks disbursement from the Earnest Money has not been performed as set forth in the applicable Pay Application. If Purchaser timely serves an Objection Notice, then Paragraph 6.1(b) hereof shall apply, Escrow Agent shall not disburse the disputed portion of the Earnest Money requested in such Disbursement Notice which is the subject of such Objection Notice until it receives written confirmation from Seller and Purchaser that Purchaser's objection to Seller's Disbursement Notice has been resolved. If Purchaser does not serve timely an Objection Notice, then Escrow Agent shall disburse promptly the Earnest Money or any portion thereof in accordance with the Disbursement Notice.

(b)      If Purchaser timely provides an Objection Notice in accordance with Paragraph 6.1(a) above, the provisions and steps set forth on **Exhibit "D"** attached hereto and incorporated herein by this reference shall apply. Purchaser and Seller acknowledge and agree that said provisions and steps set forth on **Exhibit "D"** contain an arbitration provision and mechanism.

_____          _____
    Purchaser's Initials                     Seller's Initials

6.2      Purchaser shall deposit with Chicago Title Insurance Company ("Agent") as earnest money the sum of Twenty-Five Thousand and No/100 Dollars ($25,000.00) within two (2) business days after the Effective Date (said earnest money, together with any "Additional Earnest Money" deposited by Purchaser pursuant to this Paragraph 6, and all interest thereon, is hereinafter referred to collectively as the "Earnest Money"). Purchaser shall also have the right to deposit with Agent from time to time throughout the Inspection Period additional deposits of earnest money (collectively, the "Additional IP Earnest Money"), which shall be held and disbursed subject to and in accordance with the terms and conditions of this Agreement. The Earnest Money shall in all events be applicable to the Purchase Price at Closing. Notwithstanding anything to the contrary contained herein, the Earnest Money shall be non-refundable and immediately available for use by and disbursement to Seller as provided in this Agreement, except to the extent expressly provided otherwise in Paragraphs 3, 7, 10, 11 and 14 hereof with respect to the Remaining Earnest Money (as herein defined). For purposes of this Agreement, any amount of Earnest Money not then disbursed, expended, committed or allocable to costs or expenses incurred but not yet paid for Site Design Services or other Seller's Work as provided in Paragraph 6.1 above shall be referred to herein as the "Remaining Earnest Money." Agent shall administer and disburse said Earnest Money according to the terms of this Agreement. If Purchaser does not terminate this Agreement as provided in Paragraph 3 hereof, then within five (5) business days after the expiration of the Inspection Period Purchaser shall deposit with Agent as additional earnest money the sum of One Hundred Twenty Five Thousand and No/100 Dollars ($125,000.00), provided that if Seller has deposited any Additional IP Earnest Money, the required additional earnest money deposit shall be the difference between $125,000.00 less any Additional IP Earnest Money (such required additional earnest money deposit, together with any Additional IP Earnest Money, collectively, the "Additional Earnest Money"). Without limitation, any failure by Purchaser to deposit any sum or amount required by this Paragraph 6.2 shall be and constitute an immediate Purchaser default hereunder, upon the occurrence of which Seller may elect to terminate this Agreement by written notice to Purchaser, in which event Agent shall immediately disburse to Seller any and all Earnest Money deposited pursuant to this Agreement as Seller's full and complete liquidated damages and as Seller's sole and exclusive remedy for such default (it

8

which objection shall be solely on the grounds that the work for which Seller seeks disbursement from the Earnest Money has not been performed as set forth in the applicable Pay Application. If Purchaser timely serves an Objection Notice, then Paragraph 6.1(b) hereof shall apply. Escrow Agent shall not disburse the disputed portion of the Earnest Money requested in such Disbursement Notice which is the subject of such Objection Notice until it receives written confirmation from Seller and Purchaser that Purchaser's objection to Seller's Disbursement Notice has been resolved. If Purchaser does not serve timely an Objection Notice, then Escrow Agent shall disburse promptly the Earnest Money or any portion thereof in accordance with the Disbursement Notice.

(b)    If Purchaser timely provides an Objection Notice in accordance with Paragraph 6.1(a) above, the provisions and steps set forth on **Exhibit "D"** attached hereto and incorporated herein by this reference shall apply. Purchaser and Seller acknowledge and agree that said provisions and steps set forth on **Exhibit "D"** contain an arbitration provision and mechanism.



_____                     _____
Purchaser's Initials                          Seller's Initials

6.2    Purchaser shall deposit with Chicago Title Insurance Company ("**Agent**") as earnest money the sum of Twenty-Five Thousand and No/100 Dollars ($25,000.00) within two (2) business days after the Effective Date (said earnest money, together with any "Additional Earnest Money" deposited by Purchaser pursuant to this Paragraph 6, and all interest thereon, is hereinafter referred to collectively as the "**Earnest Money**"). Purchaser shall also have the right to deposit with Agent from time to time throughout the Inspection Period additional deposits of earnest money (collectively, the "**Additional IP Earnest Money**"), which shall be held and disbursed subject to and in accordance with the terms and conditions of this Agreement. The Earnest Money shall in all events be applicable to the Purchase Price at Closing. Notwithstanding anything to the contrary contained herein, the Earnest Money shall be non-refundable and immediately available for use by and disbursement to Seller as provided in this Agreement, except to the extent expressly provided otherwise in Paragraphs 3, 7, 10, 11 and 14 hereof with respect to the Remaining Earnest Money (as herein defined). For purposes of this Agreement, any amount of Earnest Money not then disbursed, expended, committed or allocable to costs or expenses incurred but not yet paid for Site Design Services or other Seller's Work as provided in Paragraph 6.1 above shall be referred to herein as the "**Remaining Earnest Money.**" Agent shall administer and disburse said Earnest Money according to the terms of this Agreement. If Purchaser does not terminate this Agreement as provided in Paragraph 3 hereof, then within five (5) business days after the expiration of the Inspection Period Purchaser shall deposit with Agent as additional earnest money the sum of One Hundred Twenty Five Thousand and No/100 Dollars ($125,000.00), provided that if Seller has deposited any Additional IP Earnest Money, the required additional earnest money deposit shall be the difference between $125,000.00 less any Additional IP Earnest Money (such required additional earnest money deposit, together with any Additional IP Earnest Money, collectively, the "**Additional Earnest Money**"). Without limitation, any failure by Purchaser to deposit any sum or amount required by this Paragraph 6.2 shall be and constitute an immediate Purchaser default hereunder, upon the occurrence of which Seller may elect to terminate this Agreement by written notice to Purchaser, in which event Agent shall immediately disburse to Seller any and all Earnest Money deposited pursuant to this Agreement as Seller's full and complete liquidated damages and as Seller's sole and exclusive remedy for such default (it

8

Purchase Agreement-V.2

being acknowledged and agreed by Seller and Purchaser that the amount of Seller's actual damages in such circumstances would be difficult, if not impossible, to determine, and that the Earnest Money represents a reasonable pre-estimate of such damages), and the parties shall be relieved of all liability and obligations hereunder, except for those provisions which by their terms survive such termination.

7.     **CONTINGENCIES.**

7.1    **SUBDIVISION OR CONDOMINIUM OVERLAY.**

       **7.1.1**    Seller and Purchaser shall cooperate in either (i) subdividing the Overall Property into two or more separate legal lots, or (ii) enacting on and subjecting the Overall Property to one or more condominium overlays, as may be determined in Seller's sole and absolute discretion; provided, however, that in all events, the Property, as so subdivided or being a condominium unit, shall allow for and accommodate, by easement or otherwise, the use of the Property as an approximately 45,000 square foot commercial movie theater.  As used in this Paragraph 7, **"Final Subdivision"** shall mean the survey and creation of two or more separate legal lots as determined by Seller (described by separate metes and bounds legal descriptions), which have been approved by the County, or any other government subdivision having jurisdiction over the Overall Property, and which is not subject to appeal, challenge or rescission, and the recording of a subdivision plat or similar instrument to give notice of such subdivision of the Overall Property.  If Seller elects to proceed under clause (ii) above, then Seller shall prepare, enact on and subject the Overall Property to one or more condominium overlays pursuant to the laws of the State of Georgia that is consistent with and that achieves substantially the same result as described in this Paragraph 7.1.1 with respect to subdivision of the Overall Property.  As used in this Agreement, **"Final Condominium Enactment"** shall mean the creation pursuant to the laws of the State of Georgia of one or more horizontal or vertical condominium overlays under one or more condominium declarations, along with the creation of and transfer to one or more owners' associations or similar entities thereunder of all or a portion of the Overall Property affected by such condominium overlay(s), which have been approved by the County, or any other government subdivision having jurisdiction over the Overall Property, and which is not subject to appeal, challenge or rescission, and the recording of one or more condominium declarations or similar instruments to give notice of and enact such condominium overlay(s) on the Overall Property.  Subject to Paragraphs 1.2 and 1.3 hereof, Seller and Purchaser acknowledge and agree that the real property described in the term "Property" as used in this Agreement shall, subject to Paragraph 4 hereof, mean and refer to only that portion of the Overall Property depicted on said **Exhibit "A"** attached hereto, and that upon achieving Final Subdivision or Final Condominium Enactment, as the case may be, a surveyed metes and bounds legal description of the Property shall be created and attached to the limited warranty deed to be delivered by Seller to Purchaser at Closing.  Any and all expenses incurred in seeking and obtaining the subdivision or the condominium overlay(s), as the case may be, described in this Paragraph 7.1.1 shall be performed as part of the Site Design Services.  Seller agrees to keep Purchaser apprised on request as to the status of such regulatory approvals.

       **7.1.2**    Final Subdivision or Final Condominium Enactment, as the case may be, shall be achieved on or before the Closing Date, and such achievement shall be a condition precedent to each of Seller's and Purchaser's obligation to close hereunder.

9

Purchase Agreement-V.2

**7.2    OPERATING AGREEMENTS.**    This Agreement is made contingent on Purchaser's approval of, and on Seller's ability to obtain all approvals of, and to enact on and subject either or both of the Property or certain portions of the Adjoining Property determined by Seller in its sole and absolute discretion to, one or more (a) declaration(s) or similar instrument(s), or (b) condominium declaration(s), which may provide for, among other things, provisions: (i) creating access, roadway, driveway, sidewalk, utilities, parking and other easements and rights burdening and benefiting, (ii) creating and providing for shared maintenance of common areas of, (iii) creating and governing one or more owners' association(s), architectural, design or other review boards or commissions having jurisdiction or governance over, and (iv) otherwise restricting and governing the ownership, design, development, construction, building materials, landscaping, lighting, signage, use and operation of the Property and certain portions of the Adjoining Property determined by Seller in its sole and absolute discretion, however constituted or owned, as a portion of an overall project intended to be known as Fischer Crossings Shopping Center or such other name as Seller may determine in its sole and absolute discretion (the foregoing, collectively, the **"Operating Agreements"**). Purchaser agrees to reasonably cooperate with Seller's efforts to obtain and implement any of the foregoing and to execute any reasonable applications, requests, certifications or other documents requested by Seller in order to obtain or implement any of the foregoing. Further, Seller and Purchaser hereby acknowledge and agree that provided the Closing occurs, at Closing, Purchaser shall take title to the Property subject to, and the Property shall be encumbered by, the Operating Agreements.

**7.3    PLAN AND PERMIT APPROVALS.**

**7.3.1**    Seller shall use commercially reasonable good faith efforts to obtain from time to time any and all final, non-appealable permits, licenses, variances, approvals, consents or other matters pertaining to the performance of Seller's Work, which, in the sole opinion of Seller, are necessary to enable Seller to perform the Seller's Work in accordance with the Approved Plans (together with the Land Disturbance Permit (as hereinafter defined), collectively, the **"Permits"**), and Purchaser shall cooperate in good faith with Seller's efforts to obtain the Permits and shall execute any and all applications, requests, certifications, submittals, agreements and other documents as reasonably requested by Seller in order to obtain any and all of the Permits. For clarification, Seller shall have the right to draw from time to time against the Earnest Money in connection with costs and expenses incurred in connection with applying for and obtaining either or both of (x) the Approved Plans, and (y) the Permits, all to the same extent as Seller is permitted under this Agreement hereof with respect to the Site Design Services and applicable portions of Seller's Work.

**7.3.2**    This Agreement is made contingent on (a) obtaining the Approved Plans by the Approval Parties required under either or both of applicable law or as contemplated in Paragraph 3.5 above, (b) Seller and Purchaser approving the Schedules (as hereinafter defined), Seller and Purchaser hereby agreeing to cooperate in good faith to approve the same, and (c) Seller's obtaining the Permits, including, without limitation, a final, non-appealable land disturbance permit and any and all other permits and approvals which, in the sole opinion of Seller, are necessary to enable Seller to commence and perform any and all grading or other earth- or dirt-moving component(s) of Seller's Work (as hereinafter defined) (collectively, the **"Land Disturbance Permit"**) pursuant to and in accordance with the Grading Plans.

10

Purchase Agreement-V.2

**7.4    BANKRUPTCY APPROVAL.**  All obligations of the parties hereto respecting the purchase and sale of the Property pursuant to this Agreement are expressly conditioned upon the issuance of a final, non-appealable order of the Bankruptcy Court (the "**Bankruptcy Approval**"): (i) authorizing the sale of the Property to Purchaser, the execution and recording of the Operating Agreements on the Property and all or certain portions of the Overall Property pursuant to this Agreement and any other matters, approvals or transactions contemplated or required by this Agreement, and (ii) finding that the Bankruptcy Court has jurisdiction over the Seller and the Property to approve the sale, and over the Property and the Overall Property to approve the execution and recording of the Operating Agreements; that adequate notice was given to lien holders, parties in interest and creditors providing sufficient information regarding the transaction and an opportunity to object; that the transfer to Purchaser and the execution and recording of the Operating Agreements on either or both of the Property or all or certain portions of the Overall Property are in the best interest of the estate; that the transaction was negotiated in good faith and at arm's length; that Purchaser is a good faith purchaser; and that any objection to the sale has not been resolved or overruled.  Seller shall, promptly after the full execution and delivery of this Agreement by all parties hereto, submit this Agreement to the Bankruptcy Court for the Bankruptcy Court's review and consideration.

**7.5    AGREEMENT WITH LENDER.**    This    Agreement    is    made contingent on Seller and Lender entering into at or prior to Closing a written agreement (the "**Seller/Lender Draw Agreement**"), wherein Lender agrees to fund and deliver to Seller from time to time pursuant to and in accordance with the Draw Schedule (as hereinafter defined), even if there has occurred or then exists one or more defaults or events of default under, or Lender has exercised or is exercising any of its remedies under, the loan from Lender or any of the documents, instruments or agreements evidencing, securing or related to said loan, any and all amounts incurred or expended by Seller in the performance of all or any portion of either or both of the Site Design Services or the Seller's Work, together with any additional amounts which are the obligation of Purchaser hereunder or are caused by or resulting from approved Change Orders (as hereinafter defined) from time to time, and containing such other terms and conditions as are reasonably acceptable to Seller.

**7.6    FAILURE OF CONDITIONS.**    If any of the conditions set forth in this Paragraph 7 have not occurred or been obtained or achieved, as the case may be, on or before the date of Closing, then, unless Purchaser elects to terminate this Agreement by delivering to Seller written notice of such election on or before the date of Closing, any and all such conditions shall be deemed waived by Purchaser, and thereafter, provided that Seller has not elected to terminate this Agreement by delivering to Purchaser written notice of such election on or before the date of Closing, the parties hereto shall proceed to Closing in accordance with the remaining terms and provisions of this Agreement.  If either party elects to terminate this Agreement as provided in this Paragraph 7.6, then in such event this Agreement shall terminate, the Remaining Earnest Money (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) attributable to this Agreement shall be promptly (and in any event within five (5) business days) refunded to Purchaser, and the parties shall be relieved of all liability and obligations hereunder, other than with respect to obligations that expressly survive any termination of this Agreement.

**8.    CLOSING.**  The closing or settlement ("**Closing**") of this transaction shall occur on the date which is the earlier to occur of (a) the tenth (10th) day after the issuance by the

11

applicable governmental agency, body or entity of the final, non-appealable Land Disturbance Permit, or (b) May 15, 2010, but in all events subject to any extensions expressly set forth in this Agreement.

      **8.1**    At the Closing, the parties will execute and deliver a limited warranty deed subject only to the Permitted Exceptions, and all other documents reasonably necessary to consummate the transaction contemplated by this Agreement pursuant to the terms of this Agreement. Without limitation, Seller shall provide Purchaser at Closing with (i) an affidavit that Seller is not a "foreign person" within the meaning of the Foreign Investors Real Property Tax Act of 1980, as amended, (ii) evidence reasonably satisfactory to Agent of the authority of persons executing this Agreement and the other documentation to be executed and delivered by Seller hereunder, (iii) a customary owner affidavit as Agent may reasonably require in order to issue so-called owner's and lender's title insurance policies insuring Purchaser's title to the Property, subject to no exceptions other than "Permitted Exceptions" (hereinafter defined) (without limitation, specifically without any exception for (x) mechanics' or materialman's liens or broker's liens created by Seller or (y) parties in possession (except as may be approved or deemed approved by Purchaser or as expressly set forth in this Agreement)), (iv) all proper instruments as shall be reasonably required for the assignment of assignable permits, development rights and utility rights and rights to and/or for collection of any condemnation awards or other condemnation, if any, pursuant to Paragraph 11, and (v) a closing statement reflecting the payment and disbursement of the Purchase Price and other amounts in accordance with this Agreement. Without limitation, Purchaser shall provide, or cause to be provided, Seller at Closing evidence reasonably satisfactory to Seller of the authority of Purchaser and the authority of the persons executing this Agreement, the Seller/Lender Draw Agreement and the other documentation to be executed and delivered by Purchaser hereunder. The Closing shall occur at the offices of Agent in metropolitan Atlanta, Georgia unless otherwise agreed between the parties.

      **8.2**    At Closing, (a) Seller shall transfer and convey to Purchaser as an appurtenance to the Property all rights necessary for the required number of daily gallons of sewer capacity, as determined by any governmental agency, body or entity having jurisdiction over the Property and having the authority to make such determination, for the operation of an approximately 45,000 square foot commercial movie theater (the "**Required Gallons**"), and (b) Seller shall be reimbursed by Purchaser, and Purchaser shall pay to Seller, an amount equal to the product of the Required Gallons multiplied by $15.00. The foregoing reimbursement shall not be included in the calculation of the Purchase Price Balance set forth in Paragraph 30.4(b) hereof.

**9.**     **COSTS AND PRORATIONS.**

      **9.1**    At Closing, Seller shall pay all transfer taxes and Broker's commissions set forth in Paragraph 12 hereof, and Purchaser shall pay all recording fees (other than fees related to the recordation of any document necessary to cure any defect in or objection to Seller's title to the Property Seller has agreed in writing to cure, which shall be paid by Seller). Any escrow fee shall be paid one-half by Seller and one-half by Purchaser. Purchaser shall be responsible for all other closing costs incurred by Purchaser (including, without limitation, any costs, expenses or premiums for title commitments, insurance or endorsements), and Seller shall be responsible for all other closing costs incurred by Seller, including their respective attorney's fees.

      **9.2**    Ad valorem property taxes assessed against the Property for the year in which the Closing occurs and the portion of all other unpaid assessments which are due and

payable in the year in which Closing occurs shall be prorated as of the day of Closing. The Property is currently a part of a larger tax parcel. Purchaser agrees to cooperate with Seller and the owner of the other portion to create a separate tax parcel as soon as possible. If the Property is part of a larger tax parcel at Closing, Purchaser's share shall be derived by (i) multiplying the amount of taxes and assessments assessed for the entire tax parcel for the year in which Closing occurs by a fraction, the numerator of which is the number of acres of the Property and the denominator of which is the number of acres in the entire tax parcel and (ii) multiplying the product obtained in (i) above by a fraction, the numerator of which is the number of days remaining in the year in which Closing occurs, including the day of Closing, and the denominator of which is the number of days in the year in which the Closing occurs. If the current year's taxes and/or other applicable assessments have not been determined at the time of Closing, the amount of taxes and assessments in (i) above for the entire tax parcel for the year of Closing shall be based upon the previous year's taxes and assessments and Purchaser and Seller shall adjust between themselves any differences in the proration after the actual amount for the year of Closing has been determined. Purchaser shall be solely responsible for any roll-back taxes or other taxes imposed on or caused by a change in use or a change in ownership of the Property, except as expressly provided to the contrary in this Paragraph 9.

10.    **TITLE.** Purchaser shall obtain from Agent within ten (10) business days after the Effective Date, at Purchaser's sole cost and expense, an Owner's Commitment of Title Insurance, issued by Chicago Title Insurance Company ("**Commitment**"). At Closing, Seller shall cause the Property to be released from all mortgages, deeds to secure debt or liens on the Property created by or through Seller that are monetary in nature ("**Monetary Liens**") and shall terminate all existing tenancies or rights to possession of the Property (except as approved or deemed approved by Purchaser or as otherwise provided herein) ("**Tenancy Rights**"), other than rights under Title Matters. Except for Monetary Liens and Tenancy Rights, all Title Matters, all taxes and assessments not yet due and payable, and all exceptions contained in the Commitment are "**Permitted Exceptions**". If the Commitment is amended or supplemented from time to time, Purchaser shall have the right within five (5) days after receipt of such amended or updated Commitment ("**Updated Commitment**") ("**Review Period**"), to review the Updated Commitment and to give Seller notice of any new matters on such Updated Commitment that are not already "Permitted Exceptions". If Purchaser fails to so notify Seller within the Review Period, Purchaser shall be deemed to have waived its right to object to any such new matters in the Updated Commitment and such matters shall be also be deemed "Permitted Exceptions". If Purchaser does notify Seller within the Review Period of any objections to matters in the Updated Commitment that are not then Permitted Exceptions, Seller shall then have the right, but not the obligation, for a period of five (5) days after receipt of such notice, to cure or satisfy such objections (with a failure to act or respond being deemed a refusal by Seller to so cure or satisfy). If Seller does so cure or satisfy Purchaser's objections, this Agreement shall continue in effect. If any such objection is not cured or satisfied by Seller within such five (5) day period, Purchaser shall have the right during the three (3) days following the expiration of Seller's five (5) day cure period (i) to waive the objections or (ii) to terminate this Agreement, in which case the Remaining Earnest Money deposited pursuant to this Agreement (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) shall be promptly (and in any event within five (5) business days) returned to Purchaser, this Agreement shall terminate, and the parties shall be relieved of all liability and obligations hereunder, except those that expressly survive termination. If Purchaser does not give Seller written notice prior to the expiration of the three (3) day period as

13

to whether it selects (i) or (ii) above, it shall be deemed to have selected (i). The last date for Closing under this Agreement shall be extended, if and to the extent necessary to allow the above periods for responding and curing.

11.    **CASUALTY AND CONDEMNATION.**    Seller shall bear the risk of all loss or damage to the Property occurring on or before the date on which Closing occurs.  If, after the date of execution of this Agreement and prior to Closing, the Property or any improvements located thereon are destroyed or diminished in value or are otherwise materially adversely affected by governmental action or force majeure, or if Seller shall receive notice of the commencement of eminent domain or other like proceedings against the Property or any portion thereof, Seller shall immediately notify Purchaser in writing and Purchaser shall elect within ten (10) days of receipt of such notice, by delivering written notice to Seller, either (a) to terminate this Agreement in which event all Remaining Earnest Money (less $100.00 plus any portion of the Earnest Money not constituting Remaining Earnest Money, which shall be delivered and paid to Seller as consideration for entering into this Agreement and for payment or reimbursement of certain Seller obligations as contemplated in this Agreement) paid shall be promptly (and in any event within five (5) business days) refunded to Purchaser and the parties shall be relieved of all liability and obligations hereunder, except for those provisions which by their terms survive such termination; or (b) to close the transaction contemplated hereby in accordance with the terms hereof, but subject to such event or proceedings, in which event the Purchase Price shall remain the same and Seller shall transfer and assign to the Purchaser at Closing all condemnation proceeds or other compensation and rights to additional condemnation proceeds or other compensation, if any.  If Purchaser elects to purchase after receipt of such notice, all actions taken by Seller with regard to such eminent domain proceedings, including, but not limited to, negotiations, litigations, settlement, appraisals and appeals, shall be subject to the prior approval of Purchaser, which approval shall not be unreasonably withheld or delayed.  If Purchaser does not so notify Seller within said ten (10) day period, Purchaser shall be deemed to have elected to close the transaction contemplated hereby.

12.    **BROKERS.**  Purchaser is represented in this transaction by Purchaser's Broker, a licensed real estate broker.  Seller is represented in this transaction by Seller's Broker, a licensed real estate broker.  If the transaction contemplated by this Agreement is closed and consummated as provided herein, and only in such event, Seller agrees to pay a brokerage commission to Purchaser's Broker and to Seller's Broker in the amount of $80,000.00 each (a total commission of $160,000.00).  If the transaction contemplated by this Agreement is not closed for any reason whatsoever, including default or termination of this Agreement, then Seller shall have no obligation whatsoever hereunder to either Purchaser's Broker or to Seller's Broker, and neither Purchaser's Broker nor Seller's Broker shall have any claim against Seller or Purchaser with respect to the Earnest Money.  With the exception of the brokerage commissions to be paid by Seller as provided above, Purchaser, Seller, Purchaser's Broker and Seller's Broker hereby indemnify each other against, and agree to hold each other harmless from, any and all claims (and all expenses incurred in defending such claims) for a real estate commission or similar fee arising out of or in any way connected with any claimed agency relationship with the indemnitor and relating to the purchase and sale of the Property.  Except for the commissions expressly set forth in this Paragraph 12, Purchaser shall be responsible for any fee, charge, commission or other amount payable to or claimed by any broker, agent, salesperson or other person (including, without limitation, Purchaser's Broker), and Purchaser hereby indemnifies and agrees to hold harmless Seller from any and all claims (and all expenses incurred in defending such claims) for a real estate commission or similar fee arising out of or in any way connected with any claimed agency

14

relationship with the indemnitor and relating to the purchase and sale of the Property. The provisions of this Paragraph 12 shall survive any termination or expiration of this Agreement, as well as the Closing and delivery of the limited warranty deed from Seller to Purchaser at the Closing.

**12.1**    Each of Purchaser's Broker and Seller's Broker joins in the execution of the Agreement for the sole purpose of acknowledging and agreeing to be bound by the provisions contained in Paragraph 12 of this Agreement.

**13.    NOTICE.** Each notice required or permitted to be given hereunder must comply with the requirements of this Paragraph. Each such notice shall be in writing and shall be delivered either by personally delivering it, depositing it with the United States Postal Service, certified mail, return receipt requested, with adequate postage prepaid, or by depositing it with a reputable overnight courier service with all charges for delivery thereof prepaid, and in all cases addressed to the appropriate party (and marked to a particular individual's attention). Such notice shall be deemed delivered at the time of personal delivery or, if mailed or sent via overnight courier, when it is deposited as provided above. The period in which a response to any such notice must be given or any action taken with respect thereto shall commence to run from the date it is personally delivered, or if mailed or sent via overnight courier, the date of receipt of the notice by the addressee thereof, as evidenced by the return receipt. Rejection or refusal by the addressee to accept the notice shall be deemed to be receipt of the notice. In addition, the inability of the United States Postal Service or such overnight courier to deliver the notice because of a change of address or the party, of which no notice was given to the other party, shall be deemed to be the receipt of the notice sent. Such addresses may be changed by either party by designating the change of address to the other party in writing. Notification may also be sent by telecopy provided that an original of the notice shall be promptly sent thereafter if so requested by the party receiving the same. Notice by telecopy shall be deemed to have been given as of the date and time it is transmitted if the sending party produces a written confirmation with the date, time and telecopy number to which the notice was sent.

The address of Seller is:

> Fisher Crossings Development Group, LLC
> 2004 Commerce Drive North
> Suite 100
> Peachtree City, Georgia 30269
> Attn: C. Scott Seymour
> Telecopy: (770) 486-1792

With a copy to:

> Parker, Hudson, Rainer & Dobbs LLP
> 1500 Marquis Two Tower
> 285 Peachtree Center Avenue, N.E.
> Atlanta, Georgia 30303
> Attn: Kenneth H. Kraft, Esq.
> Telecopy: (404) 522-8409

The address of Purchaser is:

Purchase Agreement-V.2

Owosso 3 Cinemas, Inc.
314 E. Comstock
Owosso, Michigan 48867
Attn: Jeffrey Geiger
Telecopy: (989) 723-0359

With a copy to:

Moore, Ingram, Johnson & Steele
Emerson Overlook
326 Roswell Street
Marietta, Georgia 30060
Attn: J. Kevin Moore, Esq.
Telecopy: (770) 429-8631

14. **DEFAULT AND REMEDIES.** If this transaction does not close because of Purchaser's default, then Seller may elect to terminate this Agreement by written notice to Purchaser, in which event Agent shall immediately disburse to Seller any and all Earnest Money deposited pursuant to this Agreement as Seller's full and complete liquidated damages and as Seller's sole and exclusive remedy for such default, and the parties shall be relieved of all liability and obligations hereunder, except for those provisions which by their terms survive such termination. The parties hereby acknowledge and agree that the amount of Seller's actual damages in such circumstances would be difficult, if not impossible, to determine, and that the Earnest Money represents a reasonable pre-estimate of such damages. If Seller defaults and the sale contemplated hereby does not close, Purchaser, at its election may (a) avail itself of the equitable remedy of specific performance; or (b) terminate this Agreement by written notice to Seller, whereupon Agent shall immediately refund the Remaining Earnest Money deposited pursuant to this Agreement to Purchaser and the parties shall be relieved of all liability and obligations hereunder, except for those provisions which by their terms survive such termination. If the remedy of specific performance is not available because Seller willfully sold the Property to another private party in violation of this Agreement, then Purchaser shall have the right to pursue any other remedy available at law or in equity, including the right to seek damages from the Seller by reason of default of Seller but the total amount recoverable by Purchaser in all such actions, including attorneys' fees and other legal expenses, combined shall not exceed $10,000.

15. **TIME OF ESSENCE.** Time is of the essence for this Agreement, and each and every of its terms and provisions.

16. **ENTIRE AGREEMENT.** This Agreement embodies the entire agreement between the parties and cannot be waived or amended except by written instrument executed by Purchaser and Seller. This Agreement supersedes all prior discussions and agreements between Seller and Purchaser with respect to the Property and all other matters contained herein and constitutes the sole and entire agreement between the Seller and Purchaser with respect thereto. The execution and delivery by any of Agent, Purchaser's Broker or Seller's Broker shall not be required for any amendment or modification of this Agreement, unless and to the extent such amendment or modification purports to change any of such parties' rights or obligations under this Agreement.

16

17.   **POSSESSION.** Seller shall deliver actual possession of the Property to Purchaser at Closing, subject to the rights of Seller and third parties under the Permitted Exceptions.

18.   **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the parties' successors and assigns. Purchaser may not assign, encumber or transfer this Agreement or any interest hereunder, in whole or in part, without the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, Purchaser may assign this Agreement in its entirety and all of Purchaser's rights, duties, liabilities and obligations hereunder to any entity, the day-to-day management of which is controlled by Gary Geiger and Jeffrey Geiger without obtaining Seller's prior written consent, provided that Purchaser shall deliver to Seller written notice of such assignment, together with a written agreement whereby such permitted assignee agrees to be bound by the terms and conditions of this Agreement and to assume, perform and be liable for the duties and obligations of the Purchaser hereunder, prior to the effective date of such assignment. No assignment of this Agreement shall relieve the original Purchaser, or the then-current Purchaser, as the case may be, from or of the duties, liabilities and obligations of the Purchaser hereunder.

19.   **SURVIVING PROVISION.** Paragraphs 1.3, 1.4, 3, 5, 9.2, 12, 27, 30 and 31 of this Agreement shall survive any Closing pursuant to this Agreement, except that Paragraph 5 shall only survive to the extent expressly provided therein and, with respect thereto, only survive the Closing date for six (6) months, at which time such provisions shall be null and void, and Paragraphs 3, 12, 14 and 27 shall survive any termination of this Agreement by either Party as a matter of right hereunder or as a result of a breach of this Agreement, notwithstanding any other provisions of this Agreement to the contrary. Except as set forth in this Paragraph or as otherwise expressly set forth elsewhere in this Agreement, no provisions of this Agreement shall survive the Closing of this transaction or any termination of this Agreement.

20.   **APPLICABLE LAW.** This Agreement shall be construed and interpreted under the laws of the State of Georgia, without regard to principles of conflicts of laws thereof.

21.   **EXHIBITS.** The exhibits referred to in and attached to this Agreement are incorporated herein in full by reference.

22.   **CAPTIONS.** Titles or captions of Paragraphs or subparagraphs contained in this Agreement are inserted only as a matter or convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provisions hereof.

23.   **CONSTRUCTION OF AGREEMENT.** Purchaser and Seller acknowledge that they have read, understand and have had the opportunity to be advised by legal counsel as to each and every one of the terms, conditions, restrictions, and effects of all the provisions of this Agreement. Purchaser agrees to the enforcement of any and all of these provisions and executes this Agreement with full knowledge of these. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the provision shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the document.

24.   **COUNTERPARTS.** This Agreement may be executed and delivered in one or more counterparts and any counterpart hereof may be delivered by facsimile transmission or by

electronically mailed transmission of a scanned copy, which shall have the same force and effect as an original.

**25.    ACCEPTANCE AND EFFECTIVE DATES.** This instrument shall be regarded as an offer by the Purchaser and is open for acceptance by the Seller until 5:00 pm on the fifth day after Purchaser delivers this instrument to Seller, by which time written acceptance of this offer or a counter-offer must have been received by Purchaser. If not accepted or countered by the date referenced above, then this offer shall be considered revoked by Purchaser. The **"Effective Date"** shall be the date on which the last of Purchaser and Seller has executed this Agreement.

**26.    [Intentionally Deleted.]**

**27.    AGENT.** Agent hereby accepts its designation as such hereunder and agrees to hold and disburse the Earnest Money and any Remaining Earnest Money as herein provided. Agent shall not be liable for any acts taken in good faith, shall only be liable for its willful default or gross negligence, and may, in its sole discretion, rely upon the oral or written notices, communications, orders or instructions given by Purchaser or Seller. In the event of a dispute between Purchaser and Seller under this Agreement sufficient in the discretion of Agent to justify its doing so, Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction all money or property in its hands under the terms of this Agreement, together with such legal proceedings as it deems appropriate, and thereupon to be discharged from all further duties under this Agreement. Any such legal action may be brought in any such court as Agent shall determine to have jurisdiction thereof. Seller and Purchaser hereby agree to indemnify and hold harmless Agent against any and all losses, claims, damages, liabilities and expenses, including, without limitation, reasonable costs of investigation and counsel fees and disbursements which may be imposed upon Agent or incurred by it in connection with its acceptance of this appointment as Agent hereunder or the performance of its duties hereunder, including, without limitation, any litigation arising from this Agreement or involving the subject matter hereof; provided, however, that if Agent shall be found guilty of willful default or gross negligence under this Agreement, then, in such event, Agent shall bear all such losses, claims, damages and expenses; and provided further that neither Seller nor Purchaser shall have any liability to Agent under this indemnity provision for any cost of litigation incurred by Agent, including, without limitation, attorney fees, arising or caused solely by the conduct of the other party which results in a dispute solely between the other party and Agent. Agent shall be, and hereby is, designated as the party responsible for filing any and all Forms 1099S with the United States Internal Revenue Service as may be required with regard to any of the transactions or obligations contemplated by this Agreement. Agent shall execute and deliver at Closing one or more designation agreements confirming the foregoing.

**28.    TIME PERIODS.** If the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the law of the United States or the State of Georgia, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

**29.    AUTHORITY.**

(a)    Subject to the sentences below in this Paragraph 29(a), Seller represents and warrants to Purchaser that the individual executing this Agreement on behalf of Seller has been duly and validly authorized and that this Agreement, when so executed on behalf of Seller, will constitute the legal, valid and binding obligations of Seller, enforceable

18

against Seller in accordance with its terms. The representations and warranties in this Paragraph 29 and all of Seller's obligations under this Agreement are subject to and contingent upon the occurrence, obtaining or achievement of the conditions more particularly set forth in Paragraph 7 hereof.

(b)    Purchaser represents and warrants to Seller that the individual executing this Agreement on behalf of Purchaser has been duly and validly authorized and that this Agreement, when so executed on behalf of Purchaser, will constitute the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

**30.    SELLER'S POST-CLOSING RIGHTS AND SELLER'S WORK.**

**30.1**    Pre-Construction Approvals.  Prior to the commencement of construction by Purchaser on the Property, Purchaser shall obtain Seller's approval of any site plans (other than the Site Plan) architectural plans and specifications, landscaping plans, any other required plans or submittals, and construction timeline for Purchaser's intended development of the Property.  Such approval shall not be unreasonably or arbitrarily withheld, conditioned or delayed, but shall be deemed disapproved if Seller fails to give written approval of such other site plans, architectural plans and specifications, landscaping plans, other required plans or submittals and construction timeline or to make reasonable comments thereto within five (5) days of submission by Purchaser.

**30.2**    Right of First Refusal – Repurchase Option.  In the event Purchaser desires and has the opportunity to make a bona fide sale of the Property to a third party at any time prior to the commencement of construction on the Property, Purchaser agrees to deliver to Seller notice thereof, and Seller shall then have a period of thirty (30) days from the date of such notice in which to elect to repurchase the Property for the purchase price set forth in Paragraph 2 herein. Seller shall exercise said option to repurchase, if at all, by giving written notice thereof to Purchaser within said thirty (30) day period.  If written notice is not given to Purchaser within said thirty (30) day period, or if Seller notifies Purchaser within said thirty (30) day period that Seller elects not to exercise the foregoing repurchase option, or upon the commencement of construction on the Property, the option to repurchase set forth in this Paragraph 30.2 shall terminate absolutely, and Seller shall, upon request, execute and deliver to Purchaser a release of such repurchase option in recordable form.  If Seller shall timely exercise the foregoing repurchase option, then upon the receipt of said repurchase price in cash from Seller (which amount shall be paid within thirty (30) days after the notice of exercise of said repurchase right is given), Purchaser shall convey the Property to Seller by limited warranty deed.  At Closing, Seller and Purchaser shall execute and deliver a document sufficient to be recorded in the public real estate records to memorialize the repurchase option set forth in this Paragraph 30.2.

**30.3**    Failure to Commence Construction - Repurchase Right.  In the event Purchaser shall not have commenced construction on the Property within thirty (30) days after the completion of Seller's grading of the Property as provided in Paragraph 30.4(a)(i) below, then Seller may, at its option, repurchase the Property for the purchase price set forth in Paragraph 2 herein. Seller shall exercise said repurchase right, if at all, by giving written notice thereof to Purchaser within thirty (30) days of the expiration of said thirty (30) day period.  If written notice is not given to Purchaser within said thirty (30) day period, or if Purchaser commences construction on or before the expiration of such thirty (30) day notice period, this repurchase right shall terminate absolutely and Seller shall upon request, execute and deliver to Purchaser a release of such repurchase right in recordable form.  Upon the receipt of said repurchase price in cash from Seller (which amount shall

19

be paid within thirty (30) days after the notice of exercise of said option is given), Purchaser shall convey the Property to Seller by limited warranty deed. At Closing, Seller and Purchaser shall execute and deliver a document sufficient to be recorded in the public real estate records to memorialize the repurchase right set forth in this Paragraph 30.3

**30.4**    Seller's Work.

(a)    After Closing, Seller shall, subject to the terms and provisions of this Paragraph 30.4 and any other applicable provisions of this Agreement, at Seller's cost and expense (but subject to Seller receiving payment or reimbursement from Purchaser as provided in this Agreement), perform or cause to be performed all work and improvements on the Property shown on the Site Plan wholly lying or being outside of and excluding the area shaded by cross-hatching on the Site Plan, except that Seller shall also be obligated to grade that portion of the Property lying inside said cross-hatched area to a so-called "pad-ready" condition in accordance with the Grading Plans and meeting all applicable County requirements and compaction requirements set forth on the Approved Plans (together with the Site Design Services, collectively, the **"Seller's Work"**) in accordance with the Approved Plans. Notwithstanding the foregoing:

(i)    in no event shall Seller be obligated to incur or pay any costs or expenses in connection with, related to or arising from the performance of either or both of (x) any permits or approvals for, or work or improvements to, any portion of the Adjoining Property, or (y) Seller's Work in excess of the Purchase Price Balance (as hereinafter defined), Purchaser and Seller hereby agreeing that Purchaser shall be solely responsible for and shall pay promptly to or reimburse Seller for any and all costs and expenses in performing Seller's Work in excess of the Purchase Price Balance;

(ii)    Seller's obligation to perform the obligations set forth in this Paragraph 30.4, the Seller's Work or any portion of either of the foregoing is made contingent on, in each instance, the following: (1) obtaining the Approved Plans required under either or both of applicable law or as contemplated by either or both of Paragraph 3.5 or this Paragraph 30.4, and (2) Seller's obtaining the applicable Permits; and

(iii)    for avoidance of doubt, any and all designs, plans, specifications, permitting, approvals, consents, materials, work and other matters related to the building foundation, footings, improvements, systems, appearance, finish or build-out or infrastructure, including, without limitation, the pouring of the building pad for Purchaser's building improvements (collectively, **"Building Work"**), shall be the sole obligation and responsibility of, and shall be at the sole cost and expense of, Purchaser. All Building Work shall be done in a good and workmanlike manner and shall comply with and be in accordance with all applicable federal, state, local or private laws, statutes, restrictions, orders, rules, regulations, ordinances, permits and approvals, including, without limitation, each of the Approved Plans and the Operating Agreements.

Seller may, but shall not be obligated to, commence performing Seller's Work at any time prior to Closing, and shall "substantially complete" (as herein defined) Seller's Work or the applicable portion(s) thereof, as the case may be, in accordance with the construction schedule approved or to-be-approved by Seller and Purchaser in their reasonable discretion (as extended, adjusted, amended, modified or supplemented from time to time, including, without limitation pursuant to this paragraph, the **"Construction Schedule"**), which approved Construction Schedule shall be attached to this Agreement as **Exhibit "F"** and incorporated herein by an amendment to

20

this Agreement entered into between Seller and Purchaser at or prior to Closing, subject, however, in all events to extension or adjustment due to any of the following: (x) delays (1) caused by or resulting from (A) changes by or required by any person, party or entity (including, without limitation, any governmental agency, department, body or entity) to any or all of the Approved Plans, Construction Schedule or Change Orders, or any portions of any of them, or (B) Purchaser's failure to pay to or reimburse Seller any amount required in connection with any Change Order, (2) caused by Purchaser or anyone claiming by, through or under Purchaser, (3) by reason of acts of God, war, civil commotion, riots, strikes, picketing, or other labor disputes, unavailability or delays of labor or materials or damage to work in progress by reason of fire or other casualty or cause beyond the reasonable control of Seller (financial inability, imprudent management or negligence excepted), (4) in permitting or other review, approval or consent processes, or in connection with, resulting from or caused by any other regulatory or governmental requirements, regulations, schedules, inspections, approvals, certificates or permits, and (5) caused by or resulting from Purchaser's or Lender's, as the case may be, failure or refusal to disburse and pay to Seller any amount pursuant to either or both of this Agreement or the Seller/Lender Draw Agreement, (y) if applicable, each and every Objection Notice delivered and the time required for resolution thereof in accordance with this Agreement, or (z) deferrals of or delays in installing or planting any landscaping component of Seller's work due to seasonal or timing concerns therefor using or under prudent horticultural practices in the State of Georgia. For purposes of this Paragraph 30.4 and any other applicable provisions of this Agreement, Seller's Work shall be deemed "**substantially complete**" upon (and words of similar import shall mean) the earlier to occur of: (I) the date on which Seller executes and delivers to Purchaser a certificate that Seller's Work has been substantially completed in accordance with this Agreement (subject to any right of Seller to require completion by Seller's agents or contractors of punchlist items or correction of latent defects), or (II) Seller has incurred or expended costs or expenses in the aggregate amount of the Purchase Price Balance in connection with the performance of Seller's Work or any portion or component thereof. Furthermore, if Seller has not "substantially completed" the Seller's Work or any portion thereof in accordance with the Construction Schedule, Purchaser shall send written notice to Seller of any portion of Seller's Work which has not been so "substantially completed" (the "**Remaining Work**") and detailing the reasons that such Remaining Work has not been "substantially completed." Seller shall have thirty (30) days after Seller's receipt of said written notice to cause the Remaining Work to be "substantially completed" subject to and in accordance with the applicable terms of this Agreement. Seller hereby reserves for itself, its contractors, agents, representatives, successors and assigns, and from and after the Closing Purchaser shall be deemed to have granted and will grant to Seller, its contractors, agents, representatives, successors and assigns, any and all temporary easements and other rights on, to, from, over, under or through the Property for access, staging, storing, construction, grading, excavating and otherwise as may be necessary to prepare for, perform and complete the Seller's Work.

        (b)     Purchaser shall not be required to fund in cash at Closing, but Purchaser shall be obligated to pay or reimburse Seller from time to time in accordance with the Draw Schedule (as herein defined) and the applicable provisions of this Agreement, a total amount determined at the Closing and set forth on the closing statement executed and delivered by each of Seller and Purchaser at the Closing, which amount shall be the difference between the Purchase Price (as the same may be adjusted as provided in this Agreement at the Closing as shown on said closing statement after giving effect to any credits against the same) and the sum of any and all of the following: (v) amounts, fees, costs and expenses payable to any lender or creditor of Seller as required by either or both of the Bankruptcy Approval or in connection with the release of the Property from any Monetary Liens, (w) brokerage commissions, attorneys' fees and other professionals' fees or expenses in connection with the closing of the transactions contemplated by

this Agreement, (x) amounts, fees, costs and expenses payable in connection with any and all of the Site Design Services, the Permits and the Seller's Work performed as of the Closing, (y) other amounts, fees, costs and expenses incurred in connection with or arising from the closing of the transactions contemplated by this Agreement, and (z) other amounts, fees, costs and expenses required by or as directed by the Bankruptcy Approval (such lesser amount, the **"Purchase Price Balance"**), to fund the performance of Seller's Work.  Further, Purchaser shall cause Lender to enter into at the Closing the Seller/Lender Draw Agreement so that the Purchase Price Balance shall be disbursed and paid to Seller in accordance with the applicable portions of this Agreement, the Seller/Lender Draw Agreement and a draw schedule reasonable approved by Seller, Purchaser and Lender (as adjusted, amended, modified or supplemented from time to time, the **"Draw Schedule"**; the Construction Schedule and the Draw Schedule are sometimes referred to herein collectively as the **"Schedules"**), which approved Draw Schedule shall be attached to (1) this Agreement as **Exhibit "G"** and incorporated herein by an amendment to this Agreement entered into between Seller and Purchaser at or prior to Closing, and (2) the Seller/Lender Draw Agreement.  Notwithstanding anything to the contrary contained in this Agreement or in the Seller/Lender Draw Agreement, Purchaser shall at all times be and remain primarily liable for the disbursement, payment and reimbursement to Seller of the Purchase Price Balance or any portions thereof, and neither this Agreement, the Seller/Lender Draw Agreement nor any other agreement, document or instrument between Seller and Lender shall in any way affect, negate, terminate, cancel, modify, reduce or alter Purchaser's duties and obligations to disburse, pay and reimburse to Seller the Purchase Price Balance or any portion thereof pursuant to and in accordance with the applicable terms and conditions of this Agreement.  If, as of Closing, the Seller's Work or any portion thereof has been performed or "substantially completed," then the applicable provisions of this Paragraph 30.4 shall be deemed deleted and of no further force or effect, and the Purchase Price Balance shall be adjusted accordingly.  Any Purchase Price Balance remaining after the performance of Seller's Work in accordance with this Paragraph 30.4 shall belong to and immediately be disbursed and paid to Seller.

> (c)    If at any time and from time to time after any or all of the Approved Plans are obtained, Purchaser desires to make any alteration, substitution, addition or change to or in any or all of the Site Plan or any of the other Approved Plans (after the same has or have been consented to by Seller, each, a **"Change Order"** and collectively, the **"Change Orders"**), Purchaser shall submit to Seller for pricing by Seller or its contractors, working plans, drawings and specifications for any and all such desired Change Order.  Seller shall respond to Purchaser within five (5) business days of such request by Purchaser, with an estimate of the effect of such desired Change Order on the costs, expenses and Schedule(s) for the affected portion or portions of Seller's Work (the **"Change Order Effect Notice"**).  Purchaser shall have three (3) business days to respond to such Change Order Effect Notice, with the authorization required hereunder, although Purchaser may, within said three (3) business day period, request more time to finally respond to the Change Order Effect Notice.  A failure by Purchaser to respond to any such Change Order Effect Notice shall be denial of consent, and, upon denial, Seller and its contractors shall proceed with Seller's Work in accordance with the Approved Plans without giving effect to such Change Order.  Once the changes to the costs and any of the Schedules, if any, for such Change Order have been approved by Purchaser, (i) all references in this Agreement to the "Site Plan," either or both of the "Schedules" or the "Approved Plans," shall be to the "Site Plan," the applicable "Schedule" or the "Approved Plans", as the case may be, as changed or modified pursuant to this Section 30.4(c), and (ii) (x) if any Change Order is approved prior to Closing, the Purchase Price shall be adjusted to include the approved cost or savings for such Change Order, or (y) if any Change Order is approved at or after Closing, Purchaser shall pay to or reimburse Seller for the increased cost for such Change Order within three

Purchase Agreement-V.2

(3) business days of such Change Order's approval (or, if any such Change Order results in any savings, such savings shall be applied as a credit to other portions of Seller's Work), provided that in all events there may be a fee charged by either or both of Seller or Seller's contractor for any Change Order which reduces the costs of Seller's Work. Once the Change Order, the costs therefor and the Schedule(s) change associated therewith have been approved and a form evidencing such approval executed by Purchaser, satisfactory to Seller, is delivered to Seller, Purchaser shall have given full authorization to Seller to proceed, or to cause Seller's contractors to proceed, with the work of performing the Seller's Work in accordance with the Site Plan, either or both of the Schedules or any or all of the other Approved Plans, as the case may be, as so changed or modified; provided that any changes required by Purchaser which constitute a material deviation from the previously approved Site Plan, either or both of the Schedules or any or all of the other Approved Plans, as the case may be, shall be effective only after the approval of Seller, not to be unreasonably withheld or delayed, unless such change would result in a material delay in the completion of the work being done by Seller or Seller's contractors. From time to time as may be appropriate for the applicable phase of design, development or construction of or on the Property, Seller and Purchaser shall use commercially reasonable good faith efforts to obtain any approval or consent by the Approval Parties of or to, as applicable, any or all of the Approved Plans or either or both of the Schedules, as may be required in connection with or resulting from any Change Order made in accordance with this Paragraph 30.4(c), and shall each execute and deliver such applications, requests, certifications, submittals, agreements and other documents as may be reasonably necessary or required in order to obtain any third-party approvals or consents. Seller shall use commercially reasonable good faith efforts to obtain any and all final, non-appealable permits, licenses, variances, approvals, consents or other matters pertaining to the Permits as may be required in connection with or resulting from any Change Order made in accordance with this Paragraph 30.4(c), and Purchaser shall cooperate in good faith with Seller's efforts to obtain such items and shall execute any and all applications, requests, certifications, submittals, agreements and other documents as reasonably requested by Seller in order to obtain any and all of the foregoing. For clarification, any and all costs and expenses incurred in connection with applying for and obtaining either or both of (x) the aforementioned approvals by the Approval Parties, and (y) the aforementioned additional permits and other matters pertaining to the Permits, shall be paid or reimbursed to Seller from the Purchase Price Balance in accordance with the applicable provisions of this Agreement.

**30.5** <u>Survival</u>.      Each of the provisions of this Paragraph 30 shall survive the Closing and delivery of the limited warranty deed to be delivered at Closing.

**31.   AS IS.   SUBJECT ONLY TO THE PERFORMANCE OF SELLER'S OBLIGATIONS UNDER PARAGRAPH 30.4 ABOVE (COLLECTIVELY, "SELLER'S WORK OBLIGATIONS"), PURCHASER AGREES PURCHASER IS (A) OBTAINING THE PROPERTY, AND SHALL ACCEPT THE PROPERTY AND, UPON SELLER'S PERFORMANCE OF SELLER'S WORK OBLIGATIONS, SELLER'S WORK, "AS IS" "WHERE IS" AND "WITH ALL FAULTS," (B) THAT SELLER MAKES NO REPRESENTATION OR WARRANTY CONCERNING ANY OR ALL OF THE PROPERTY, THE SELLER'S WORK, THE SELLER'S WORK OBLIGATIONS OR ANY OTHER MATTER, EXCEPT AS SPECIFICALLY, AND ONLY TO THE EXTENT EXPRESSLY SET FORTH IN, PARAGRAPH 5 AND THE LIMITED WARRANTY DEED TO BE DELIVERED AT CLOSING, AND (C) UPON SELLER'S PERFORMANCE OF SELLER'S WORK OBLIGATIONS, PURCHASER, FOR ITSELF, ITS AFFILIATES, SHAREHOLDERS, PARENT ENTITIES, DIRECTORS, OFFICERS, REPRESENTATIVES, AGENTS, SUCCESSORS AND ASSIGNS, SHALL WAIVE AND**

23

RELEASE, AND IS DEEMED HEREBY TO HAVE WAIVED AND RELEASED, ANY AND ALL CLAIMS, LIABILITIES, DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, DEBTS, SUMS OF MONEY, TORTS, CONTROVERSIES, PROMISES, DAMAGES OR JUDGMENTS AGAINST OR FROM THE PROPERTY, THE ADJOINING PROPERTY, SELLER AND ANY AND ALL OF SELLER'S AFFILIATES, MEMBERS, MANAGERS, PARENT ENTITIES, REPRESENTATIVES, SUCCESSORS AND ASSIGNS, ARISING FROM, IN CONNECTION WITH OR CAUSED BY ANY OR ALL OF THE PROPERTY, THE SELLER'S WORK OR THE PERFORMANCE OF SELLER'S WORK OBLIGATIONS. NOTWITHSTANDING THE FOREGOING, UPON THE COMPLETION OF SELLER'S WORK, SELLER SHALL ASSIGN TO PURCHASER, TO THE EXTENT ASSIGNABLE, ANY AND ALL WARRANTIES PROVIDED TO OR FOR THE BENEFIT OF SELLER BY ANY CONTRACTOR OR VENDOR OF SELLER IN CONNECTION WITH SELLER'S WORK.   THIS PARAGRAPH 31 SHALL SURVIVE ANY EXPIRATION OR TERMINATION OF THIS AGREEMENT, AND THE CLOSING AND DELIVERY OF THE LIMITED WARRANTY DEED TO BE DELIVERED AT CLOSING.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES BEGIN ON NEXT PAGE.]*

24

IN WITNESS WHEREOF, the undersigned have set their hands and seals hereto as of this day and year indicated under their signature.

PURCHASER:    OWOSSO 3 CINEMAS, INC.

BY: _____ Jeffrey Geige(
Name: _____
Title: Authorized Agent _____

[CORPORATE SEAL]

DATE SIGNED: 1-4-2010

SELLER:        FISCHER CROSSINGS DEVELOPMENT GROUP, LLC

BY: _____
C. Scott Seymour, its Manager/Member

DATE SIGNED: _____

PURCHASER'S BROKER:        COLLIERS SPECTRUM CAUBLE REALTY, LLC

BY: _____
Name: _____
Title: _____

DATE SIGNED: _____

SELLER'S BROKER:        CB RICHARD ELLIS, INC.

BY: _____
Name: _____
Title: _____

[CORPORATE SEAL]

**IN WITNESS WHEREOF,** the undersigned have set their hands and seals hereto as of this day and year indicated under their signature.

<u>PURCHASER:</u>   OWOSSO 3 CINEMAS, INC.

BY:_____

     Name: _____

     Title: _____

[CORPORATE SEAL]

DATE SIGNED:_____

<u>SELLER:</u>     FISCHER CROSSINGS DEVELOPMENT GROUP, LLC

BY:_____

     C. Scott Seymour, its Manager/Member

DATE SIGNED: _1/5/2010_

<u>PURCHASER'S BROKER:</u>   COLLIERS SPECTRUM CAUBLE REALTY, LLC

BY:_____

     Name: _____

     Title: _____

DATE SIGNED:_____

<u>SELLER'S BROKER:</u>   CB RICHARD ELLIS, INC.

BY:_____

     Name: _____

     Title: _____

[CORPORATE SEAL]

**IN WITNESS WHEREOF,** the undersigned have set their hands and seals hereto as of this day and year indicated under their signature.

PURCHASER:    OWOSSO 3 CINEMAS, INC.

      BY:_____

      Name: _____

      Title: _____

             [CORPORATE SEAL]

DATE SIGNED:_____

 

SELLER:    FISCHER CROSSINGS DEVELOPMENT GROUP, LLC

      BY:_____
          C. Scott Seymour, its Manager/Member

DATE SIGNED:_____

 

PURCHASER'S BROKER:    COLLIERS SPECTRUM CAUBLE REALTY, LLC

      BY:_____

      Name: _____

      Title: _____

DATE SIGNED:_____

SELLER'S BROKER:    CB RICHARD ELLIS, INC.

      BY: _____

      Name: _____Charles Olsen_____

      Title: _____Sr. Managing Director_____

             [CORPORATE SEAL]    *1-4-2010*

IN WITNESS WHEREOF, the undersigned have set their hands and seals hereto as of this day and year indicated under their signature.

PURCHASER:   OWOSSO 3 CINEMAS, INC.

BY: _____
Name: _____
Title: _____

[CORPORATE SEAL]

DATE SIGNED: _____

SELLER:       FISCHER CROSSINGS DEVELOPMENT GROUP, LLC

BY: _____
        C. Scott Seymour, its Manager/Member

DATE SIGNED: _____

PURCHASER'S BROKER:      COLLIERS SPECTRUM CAUBLE REALTY, LLC

BY: _____
Name: _Jonathan D. _____
Title: _President_____
DATE SIGNED: _1/7/10_

SELLER'S BROKER:      CB RICHARD ELLIS, INC.

BY: _____
Name: _____
Title: _____

[CORPORATE SEAL]

1316844_6                          25                    Purchase Agreement-V.2

## JOINDER BY AGENT

CHICAGO TITLE INSURANCE COMPANY, referred to in this Agreement as the "**Agent**," hereby acknowledges that it received this Agreement executed by Seller and Purchaser on the ___7th___ day of January, 2010, and accepts the obligations of the Agent as set forth herein. It further acknowledges that it received the initial deposit of the Earnest Money on the _8th_ day of January, 2010. Agent hereby agrees to hold and distribute the Earnest Money in accordance with the terms and provisions of this Agreement.

**CHICAGO TITLE INSURANCE COMPANY**

By: _____

Name: _Nancy W. Lee_____

Title: _GA Escrow Adm._____

26

EXHIBIT A



FISCHER CROSSINGS DEVELOPMENT
INTERSECTION OF STATE ROUTE 34 AND FISCHER ROAD
SEYMOUR CONSTRUCTION & LAND DEVELOPMENT

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE PROPERTY**

[TO BE INSERTED BY AMENDMENT]

## EXHIBIT "B"

### ADJOINING PROPERTY

Tract One:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 133 AND 153 OF THE 6TH LAND DISTRICT, COWETA COUNTY, GEORGIA, BEING IDENTIFIED AS 21.60 ACRES ACCORDING TO PLAT OF SURVEY FOR JAMES VAN MOTTOLA DATED MAY 2, 2005, MADE BY MCLAIN SURVEYING, INC., GEORGIA R.L.S, OF RECORD IN PLAT BOOK 83, PAGE 292, COWETA COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN BY REFERENCE.

TOGETHER WITH A NON EXCLUSIVE PERPETUAL EASEMENT FOR PURPOSES OF INGRESS AND EGRESS OVER, THROUGH AND ACROSS THAT CERTAIN PARCEL OF LAND DESIGNATED AS "ACCESS EASEMENT" ACCORDING TO THE ABOVE REFERENCED PLAT, REFERENCE TO WHICH PLAT IS HEREBY MADE FOR A MORE PARTICULAR AND ACCURATE DESCRIPTION OF THE EASEMENT HEREIN CONVEYED.

Tract Two:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 153 OF THE 6TH LAND DISTRICT, COWETA COUNTY, GEORGIA, CONTAINING 36.35 ACRES ACCORDING TO SURVEY FOR CALUMET HOLDINGS, LLC BY MCLAIN SURVEYING, INC., RLS, DATED JUNE 8, 2005, WHICH SURVEY IS RECORDED IN PLAT BOOK 84, PAGE 66, COWETA COUNTY RECORDS, WHICH PLAT IS INCORPORATED HEREIN BY REFERENCE.

## Tract Three:

All that tract or parcel of land lying and being in Land Lot 153 of the 6th District, Coweta County, Georgia, being more particularly described as follows:

Begin at intersection of northerly side of right-of-way of Georgia Highway 34 with the East side of right-of-way of Dr. Fisher Road and run thence North 5 degrees West along the easterly side of right-of-way of Dr. Fisher Road 377 feet, more or less, to an aluminum pin and which pin is South 4 degrees 0 minutes East 350 feet from the intersection of East side of Dr. Fisher Road with Southerly side of 30 foot drive leading to Wynn's Pond; thence North 90 degrees East 110 feet; thence South 79 degrees 57 minutes East 736.6 feet; thence North 1 degree 02 minutes East 207.4 feet; thence North 0 degrees 4 minutes West 153.9 feet to the South side of 30 foot drive leading to Wynn's Pond; thence along the southerly side of said drive to Wynn's Pond the following courses and distances to-wit: North 74 degrees 30 minutes East 207.6 feet; North 83 degrees 23 minutes East 146.2 feet; North 69 degrees 35 minutes East 188.9 feet; North 64 degrees 58 minutes East 143.5 feet; North 76 degrees 20 minutes East 208.9 feet; North 74 degrees 35 minutes East 259.5 feet; North 86 degrees 58 minutes East 100 feet; South 74 degrees 46 minutes East 175.6 feet; South 74 degrees 27 minutes East 104.8 feet to the Northeast corner of property herein described; thence South 7 degrees 30 minutes West 1200 feet, more or less, to northerly side of State Highway 34; thence westerly along the northerly side of State Highway 34 2191.5 feet to beginning point.

LESS AND EXCEPT:

a)    All that tract or parcel of land situate, lying and being in the County of Coweta, Georgia being in Land Lot 153 of the Sixth Land District of Coweta County, Georgia and being more particularly described as follows:

Beginning at a point on the southerly right of way of Wynn's Pond Road, being measured along the contour of the southerly right of way of said Wynn's Pond Road a distance of nine hundred point two zero feet (900.20') from the east side right of way of Dr. Fischer Road, thence running north seventy-four degrees thirty minutes (74 degrees 30 minutes) east along the southerly right of way of Wynn's Pond Road two hundred three point zero eight (203.08') feet to a point, thence running south one degree zero two minutes (S 1 degree 02 minutes) west three hundred sixty two point one five (362.15') feet to a point, thence running south seventy four degrees thirty minutes (74 degrees 30 minutes) west two hundred (200') feet to the southeast corner of the Michael Justice property, thence running north one degree zero two minutes (1 degree 02 minutes) east two hundred seven point four zero (207.40') feet to an aluminum pipe, thence running north zero degrees four minutes (0 degrees 04 minutes) west one hundred fifty-three point nine (153.9') feet to the point of beginning.

b)    Property described in the Right of Way Deeds in favor of the Georgia Department of Transportation dated February 14, 1996, filed February 15, 1996, recorded in Deed Book 999, page 588, and dated and filed August 16, 2002, recorded in Deed Book 1964, page 417, Coweta County records.

Purchase Agreement-V.2

**Tract Four:**

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 153 OF THE 6TH LAND DISTRICT, COWETA COUNTY, GEORGIA, AND BEING THE WESTERLY PORTION OF LANDS CONVEYED BY FRANCES S. PENISTON AND MARGARET P. POWELL, TRUSTEES UNDER ITEM SIX OF THE WILL OF J. B. PENISTON ON MARCH 15, 1968, AS RECORDED IN DEED BOOK 149, PAGE 321, COWETA COUNTY RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE INTERSECTION OF THE EAST SIDE OF RIGHT OF WAY OF DR. FISHER ROAD WITH THE SOUTHERLY SIDE OF A 30 FOOT DRIVE LEADING TO WYNN'S POND, AND RUN SOUTH 04 DEGREES 00 MINUTES 00 SECONDS EAST ALONG THE EAST SIDE OF SAID RIGHT OF WAY 350 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST 110 FEET; THENCE SOUTH 79 DEGREES 57 MINUTES 00 SECONDS EAST 400 FEET; THENCE NORTHERLY 265 FEET, MORE OR LESS, TO THE SOUTHERLY SIDE OF THE SAID 30 FOOT DRIVE LEADING TO WYNN'S POND; THENCE WESTERLY AND NORTHWESTERLY ALONG THE SOUTHERLY SIDE OF SAID 30 FOOT DRIVE 593.6 FEET TO THE INTERSECTION OF SAID 30 FOOT DRIVE WITH THE EAST SIDE OF THE RIGHT OF WAY OF DR. FISHER ROAD AT THE POINT OF BEGINNING.

LESS & EXCEPT ALL THAT TRACT OR PARCEL OF LAND CONTAINING TWO (2) ACRES, MORE OR LESS, DEEDED TO CHRISTOPHER WENDELL CAMP AND PEGGY BAUMAN CAMP BY WARRANTY DEED DATED DECEMBER 28, 1983, RECORDED IN DEED BOOK 359, PAGE 77, COWETA COUNTY RECORDS.

**Tract Five:**

All that tract or parcel of land lying and being in Land Lot 153 of the 6th Land District, Coweta County, Georgia, being more particularly described as follows:

BEGIN at the intersection of the east side of right of way of Dr. Fisher Road with the southerly side of a 30 foot drive leading to Wynn's Pond, and run south 4 degrees 0 minutes east along the east side of said right of way 350 feet; thence north 90 degrees east 110 feet; thence south 79 degrees 57 minutes east 145 feet; thence north 4 degrees 0 minutes west approximately 340 feet to the southerly side of the above mentioned 30 foot drive to Wynn's Pond; thence northwesterly and westerly along the southerly side of Wynn's Pond Drive approximately 265 feet to the point of beginning.

LESS & EXCEPT property described in Right of Way Deed in favor of Department of Transportation, dated November 25, 2003, recorded in Deed Book 2381, page 136, Coweta County records.

3

Tract Six:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 153 OF THE 6TH LAND DISTRICT, COWETA COUNTY, GEORGIA, BEING MORE PARTICULARLY DESCRIBED AS THAT 1.60 ACRE PARCEL AS DEPICTED ON THAT CERTAIN SURVEY OF RECORD AT PLAT BOOK 45, PAGE 90, COWETA COUNTY, GEORGIA, WHICH PLAT IS INCORPORATED HEREIN BY REFERENCE.

Tract Seven:

All that tract or parcel of land containing 3 acres, more or less, located in Land Lot 153 of the 6th Land District, Coweta County, Georgia, more particularly described in accordance with survey made by J. William Ozmore, dated March 14, 1968, being of record in Plat Book 11, page 43, Coweta County records, being more particularly described as follows:

BEGIN at a point on the southerly side of a 30 foot drive leading from the Dr. Fisher Road to Wynn's Pond, and which point is 593.6 feet easterly of the intersection made by the southerly side of said 30 foot drive with the easterly side of the right of way of Dr. Fisher Road, as measured along the southerly side of said 30 foot drive, and thence along the southerly side of said 30 foot drive 306.6 feet to an aluminum pin; thence south 0 degrees 4 minutes east 153.9 feet to an aluminum pin; thence south 1 degree 2 minutes west 207.4 feet to an aluminum pin; thence north 79 degrees 57 seconds west 336.6 feet; thence northerly 265 feet, more or less, to the southerly side of said 30 foot drive at the point of beginning.

TOGETHER WITH easement rights contained in the following:

a.    Warranty Deed from William A. Sumner, Jr. to Michael E. Justice and Charlotte Q. Justice, dated April 27, 1984, filed May 3, 1984, recorded in Deed Book 364, page 268, Coweta County records; and

b.    Easement Agreement by and between William A. Sumner, Jr. and Thomas E. Camp and Michael E. Justice and Charlotte Q. Justice, dated April 27, 1984, filed May 3, 1984, recorded in Deed Book 364, page 270, aforesaid records..

**LESS AND EXCEPT FROM THE FOREGOING TRACTS ONE-SEVEN, THE "PROPERTY" (AS SUCH TERM IS DEFINED IN THE FOREGOING AGREEMENT).**

1316844_6                                                                 Purchase Agreement-V.2

## EXHIBIT "C"

**ENGINEERING AGREEMENT**

[See attached.]



# PROPOSAL

Presented To                     **Scott Seymour**

Project Description:             **Fischer Crossing – NE Tract Theater**

Project Manager:                 **Nick Sawka**

**December 9, 2009**



LAI ENGINEERING



# Executive Summary

| | |
|---|---|
| Client Name: | **Scott Seymour** |
| Project Name: | **Fischer Crossing – NE Tract Theater** |
| Location: | **Hwy 34 & Hwy 54, Coweta County @ Peachtree City, GA** |
| LAI #: | **9217** |

**December 9, 2009**

## Proposal for Design/Construction Services

We are pleased to respond to your request for Civil Site Design of the NE Tract of property located at the intersection of State Route 34/54 and Fischer Road in Coweta County. This proposal is for the Site Design of the Eastern most 20+/- acres of property to support a Neighborhood Cinema and design two pad graded outparcels with supporting utilities that will support a proposed gas station and ALDI grocery store. The site specific plans for the gas station and ALDI grocery are not part of this proposal. Future site specific designs for the two outparcels will be contracted directly with each tenant separately at the time of requested services. The site has already been rough graded with drainage trunk lines already installed for storm sewer tie-ins. No utilities currently exist on-site. This proposal is based off the assumption that no further rezoning or Site Plan negotiations will have to take place with Coweta County prior to design approval or issuance of the LDP (Land Disturbance Permit). Attached is the reapproved Site Plan that Coweta County Commissioners approved on December 4, 2009 modifying the eastern portion of the site where the cinema is currently proposed. Prior to and design plans being started the owner/developer will escrow a minimum of 70% of the contract shown below for LAI Engineering to bill against each month during the design process. The remaining portion of the contract will be paid to LAI Engineering from the developer at the closing from the proceeds coming from Neighborhood Cinema. Below is the breakdown of design services with fees:

| | Site Scope of Services | Design Fee |
|---|---|---|
| **Site** | On-Site Civil Document Preparation | $80,400.00 |
| | Tenant Specific Detailing Document Preparation | $15,000.00 |
| | Permit Phase Services | $ 8,000.00 |
| | ESC Assistance and Construction Admin. | $ 15,000.00 |
| | Construction Administration | $12,000.00 |
| | Landscape Design | $15,000.00 |
| **Traffic** | Traffic Engineering Scope of Services | Design Fee |
| | Traffic Signal Design Plans | $10,500.00 |
| | Traffic Signal Communication Plans | $ 2,200.00 |
| | Traffic Signal Permitting Services | $ 2,200.00 |
| **Roadway** | Roadway Scope of Services | Design Fee |
| | GDOT Entrance Drive Design Plans | $ 6,000.00 |
| | GDOT Entrance Drive Permitting | $ 4,000.00 |

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev.05.28.08



| | | |
|---|---|---|
| **Survey** | Survey Scope of Services | Design Fee |
| | Boundary Survey, Subdivision Plat & Recording | $15,500.00 |
| | ALTA/ACSM Land Title Survey of Cinema Tract | $8,500.00 |
| | Construction Layout Staking of Cinema Site and Utilities | $20,000.00 |
| | As-Built Survey of Cinema Site and Utilities | $5,000.00 |
| **Sub-Consultant** | Sub-Consultant Scope of Services | Design Fee |
| | Irrigation Design Plan | $6,500.00 |
| | Site Lighting Plan | $1,500.00 |
| **Total** | | $227,300.00 |



**Figure A** – Preliminary Site Plan that proposal is based on.  If Site Plan layout changes significantly after preliminary plans are developed additional design fees maybe charged to client for redesign of Site Plan. Client will be notified before design work begins and an Add-Service contract will be negotiated.

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev 05.28.03



# Proposal Authorization

Client Copy:

(Retain for your records)

| | |
|---|---|
| Client Name: | **Scott Seymour** |
| Project Name: | **Fischer Crossing – NE Tract Theater** |
| Location: | **Hwy 34 & Hwy 54, Coweta County @ Peachtree City, GA** |
| LAI #: | **9217** |

**December 9, 2009**

## Proposal for Design/Construction Services

I authorize LAI Engineering to proceed with the services as outlined in this Proposal for Engineering and related professional services.  I certify that the company I represent authorizes me to enter into this Agreement on its behalf, and I agree to all the terms set forth in this Proposal for Engineering Services and LAI Engineering Terms and Conditions.  If there are any areas not addressed by this proposal, please call so we can make adjustments to meet your needs.  This proposal is good for 30 calendar days from the date of submittal.  Please sign in the space below and return to us as your acceptance of this agreement.

Best regards,

**LAI Engineering**                          **ACCEPTED:**

James A. Lowe, P.E.                          Name

President                          

                          MANAGER

                          Title

Nicholas Sawka                          12/14/2009

Project Manager                          Date

Page 5 of 18
October 19, 2009

1800 Parkway Place, Ste. 720  |  Marietta, Georgia 30067  |  tel. 770.423.0807  |  fax 770.423.1262

Rev:05 20.08



# Proposal Authorization

LAI Copy:

(Sign & return to LAI Engineering)

| | |
|---|---|
| Client Name: | **Scott Seymour** |
| Project Name: | **Fischer Crossing – NE Tract Theater** |
| Location: | **Hwy 34 & Hwy 54, Coweta County @ Peachtree City, GA** |
| LAI #: | **9217** |

**December 9, 2009**

## Proposal for Design/Construction Services

I authorize LAI Engineering to proceed with the services as outlined in this Proposal for Engineering and related professional services. I certify that the company I represent authorizes me to enter into this Agreement on its behalf, and I agree to all the terms set forth in this Proposal for Engineering Services and LAI Engineering Terms and Conditions. If there are any areas not addressed by this proposal, please call so we can make adjustments to meet your needs. This proposal is good for 30 calendar days from the date of submittal. Please sign in the space below and return to us as your acceptance of this agreement.

Best regards,

**LAI Engineering**                                          **ACCEPTED:**

_____

James A. Lowe, P.E.                                          Name

President

_____

                                                            Title

_____

Nicholas Sawka                                              Date

Project Manager

Page 6 of 18
October 19, 2009

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev.05 20.08



# Site Scope of Service

This proposal is for the Site Design of the Eastern most 20+/- acres of property to support a Neighborhood Cinema and design two pad graded outparcels with supporting utilities that will support a proposed gas station and ALDI grocery store. The site specific plans for the gas station and ALDI grocery are not part of this proposal., as outlined as 'SITE' portions on the previously shown plan. LAI Engineering will prepare civil engineering design documents that address every project's specific needs as well as your priorities.

**Site**          Civil Document Preparation                                    **$145,400.00**

- **Site Plan** - Plan will include the horizontal controls for layout of the building, curb and gutter, and parking. We will show location of striping, directional arrows, and signage; as well as area calculations, parking information, and building information.

- **Site Grading and Storm Drainage Plan** - Plan will include the finish floor elevations, finished and existing contours, spot elevations, and storm drainage pipe and inlets. This includes pipe drainage calculations, detention pond layout, and inlet capacity calculations as needed as well as required pipe profiles.

- **Hydrology Study** – A hydrology study is **not included** in this contract. The site already has existing detention ponds located on it. All detention ponds and hydrology design has been previously designed and permitted with Coweta County by another engineering company in a previous phase of the project.

- **Erosion Control Phased Plan** - Plans will include staged phasing of the BMP treatment measures necessary to meeting state and local requirements. Typically three phases are necessary to meet state requirements.

- **Utility Plan** - Plan will include the layout and design of the domestic and fire water mains, sanitary sewer, gas, telephone, and electric service to this development. LAI will coordinate with utility companies for approval. Plans will include profiles of the proposed sanitary sewer lines. We have assumed that the sanitary sewer can be gravity flow and have not included a lift station design within our scope.

- **Landscaping Plan** – Plans to include the planting plan, calculations and details per municipal code. This does not include any hardscape planning.

- **Sitework Details** - Plans will include sitework details for site, grading, and utilities required for this project; including such items as curbs, inlets, manholes, erosion control BMPs, and pavement sections based upon recommendations from the owner's/client's geotechnical engineer.

1800 Parkway Place, Ste. 720  |  Marietta, Georgia 30067  |  tel.770.423.0807  |  fax 770.423.1262

Rev.05.20.08



# Summary of Fees (Site Design Phase):

| Site | Site Scope of Services | Design Fee |
|---|---|---|
| | On-Site Civil Documentation Preparation | $ 80,400.00 |
| | Tenant Specific Detailing Document Preparation (for Cinema) | $ 15,000.00 |
| | Permit Phase Services | $ 8,000.00 |
| | ESC Assistance and Construction Admin. | $ 15,000.00 |
| | Construction Administration | $ 12,000.00 |
| | Landscape Design | $ 16,000.00 |
| **Total** | | **$146,400.00** |

# Traffic Engineering Scope of Service

Our proposal to provide traffic services for one traffic signal design at the existing median break at the intersection of State Route 34 and State Route 54 where both roads join as one continuous State Route heading east towards Peachtree City. The traffic counts have already taken place as part of the DRI study. This proposal assumes no other traffic counts will be required as part of our design. Also, included as part of our signal design is a communication plan to have the signal at the intersection of SR34 and Fischer Road communicate with our new upgraded signal for timing purposes.

**Traffic**      Final Traffic Signal Plans                          **$10,500.00**

- We will prepare final traffic signal plans for the proposed traffic signals following receipt from the County and GDOT of their comments on the preliminary plans.
- The detailed traffic signal plans will include final traffic signal poles, traffic signal displays, traffic signal phasing, traffic signal general notes, pavement markings, signing, and standard details as needed.
- Reference will be made to GDOT details, standards, and specifications as appropriate.

**Traffic**      Traffic Signal Communication Plans                  **$2,200.00**

- We will prepare traffic signal communication plans for the proposed traffic signal.
- The plans will consist of an intersection communication plan and a communication route plan depicting the traffic signal poles, controller cabinet, aerial or underground cable, splice point into cabinet and connectivity to existing adjacent signalized intersections.
- We will discuss with the County and / or City and GDOT to review their comments to finalize the plans.

Project deliverables will be 24" x 36" bond and five (5) record sets of prints signed and sealed by a Professional Engineer registered in Georgia will be submitted to the County and/or City reviewing agency. Structural design of the poles and/or foundations is not included in this proposal. The plans and specifications will refer to GDOT specifications and standards.

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev.05 20.08



# Summary of Fees (Traffic Design Phase)

| Traffic | | Design Fee |
|---|---|---|
| | Traffic Signal Design Fees | $10,500.00 |
| | Traffic Signal Communication Plans | $ 2,200.00 |
| | Traffic Signal Permitting Services | $ 2,200.00 |
| **Total** | | **$14,900.00** |

Additional coordination or presentations can be provided at an hourly rate in accordance with the attached Terms and Conditions. This is a lump sum fee excluding reimbursable expenses. Fees will be billed monthly based on services rendered in accordance with the attached Terms and Condition.

# Roadway Engineering Scope of Service

Our proposal to provide traffic services for two driveway entrances on State Route 34/54 for the proposed 20 acre Theater Site. As part of the drive entrance design thru-lanes to SR 34/54 will be designed per the DRI recommendations previously permitted with GRTA. No other roadway design is included in this proposal.

| Roadway | Preparation of Roadway Construction Documents | $10,000.00 |
|---|---|---|

- **Roadway Crossing Sections (Detailed)** – Depicts the ground conditions perpendicular to the proposed centerline alignment at a specified distance (usually 50 ft) and displays cross slope tie in conditions to ensure drainage and right-of-way requirements/restrictions are met.
- **Roadway Storm Drainage Profiles/Drainage Sections** – Depicts proposed and existing storm drainage inlets and piping systems to collect and discharge water from roadway.
- **Roadway Signing and Pavement Marking Plan** - Provides type and location of traffic signs and pavement markings as they would appear upon project completion in accordance with the Manual of Uniform Traffic Control Devices (MUTCD) and local municipality standards.
- **Roadway Erosion and Sedimentation Control Plan** - Indicates type and location of temporary and permanent erosion control measures per local requirements.
- **Roadway Signal Plans** – Coordination of horizontal layout of proposed signalized intersection including equipment details, loop locations, electrical circuitry, signal phasing, and other relevant data (signal design and analysis performed separately).
- **Roadway Driveway Profiles** - Provides vertical design and details of driveways along the mainline alignment to insure adequate access is maintained (where applicable).
- **Roadway Intersection Plans** - Provides specific layout and details for intersections involving turning movements and design of tapers, turn lanes, special drainage, grading, and alignment geometry.
- **Roadway Utility Information Plans** - Provides graphical representation of type and approximate location of existing above-ground and underground utilities along with type and location of proposed utilities to be

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev.05.20.08



constructed or relocated. This existing and proposed information is provided by the utility owners or their engineers.

# Summary of Fees
# (Roadway Design Phase)

| Roadway | | Design Fee |
|---|---|---|
| | GDOT Entrance Drive Design Plans | $ 6,000.00 |
| | GDOT Entrance Drive Permitting | $ 4,000.00 |
| Total | | $10,000.00 |

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev.05.20.08



# Survey Scope of Service

Because our survey staff is an in-house resource, you can be sure that engineering and survey tasks are closely coordinated. Engineering needs are planned upfront and survey details are transmitted back to our engineering team quickly and accurately. When surveying and engineering resources are under a single roof, your project is streamlined and costs are reduced.

LAI Engineering will provide a complete survey as specified below. The site consists of approximately 20 acres located along State Route 34 and State Route 54 in Coweta County, Georgia.

**Survey**        Boundary Survey, Subdivision of Cinema Tract, and Recording                        **$15,500.00**

- Current deeds and / or right-of-way plans will be used to establish the boundary and right-of-way lines.
- LAI Engineering will endeavor to depict easements of record for the above mentioned site but certification cannot be provided for all encumbrances of record unless an ALTA / ACSM survey is requested and a current title inspection report is provided.
- All above ground existing features will be located and shown on the survey. These items will include buildings, overhangs, curbing, pavement, concrete and above ground evidence of utilities.
- Topographic information will not be provided as a part of this survey scope.
- Only above ground evidence of utilities will be shown on the survey.
- The survey will be provided on an appropriate sheet size and at a scale no larger than 1" = 60'.
- Please note that additional items such as surveying appurtenant easement areas (offsite easements) or preparing easement exhibit plats will be billed at our standard hourly rates.
- Subdivision platting is provided under this scope for the Cinema Tract.

**Survey**        ALTA / ACSM Land Title Survey of Cinema Tract and Gas Station Tract                **$8,500.00**

- The survey will conform to the minimum standard detail requirements as adopted by ALTA / ACSM in 2005.
- The standard ALTA / ACSM Land Title Survey Certification will be placed upon the face of the survey (see attached).
- LAI will endeavor to recover all property corners. Current deeds, plats, exhibits, and right-of-way plans that are on public record or provided from the client, will be utilized to establish the boundary and right-of-way lines.
- LAI Engineering will endeavor to depict easements of record for the above mentioned site. Certification cannot be provided for all encumbrances of record until a current title inspection report is provided. It is the client's responsibility to ensure said title report is delivered to LAI Engineering within one week from notice to proceed, or one week prior to due date.
- Please note that neither topographic nor state plane coordinate information will be provided as a part of this survey scope.
- Only above ground evidence of utilities will be shown on the survey.

1800 Parkway Place, Ste. 720  |  Marietta, Georgia 30067  |  tel.770.423.0807  |  fax 770.423.1262

Rev.05 26 08



- The survey will be provided on an appropriate sheet size and at a scale no larger than 1" = 60'.
- Revisions and any extra trips to the site in reference to requested revisions will be billed at our standard hourly rates as listed in our attached terms and conditions.
- Please note that additional items such as surveying appurtenant easement areas (offsite easements) or preparing easement exhibit plats will be billed at our standard hourly rates as well.
- Final ALTA / ACSM certification cannot be issued until we are provided with a current Title Inspection Report, including all supporting documents referenced in said report.

## Table A – Optional Survey Responsibilities & Specifications

NOTE: The items of Table A must be negotiated between the surveyor and client. It may be necessary for the surveyor to qualify or expand upon the description of these items, e.g., in reference to Item 6, there may be a need for an interpretation of a restriction. The surveyor cannot make a certification on the basis of an interpretation or opinion of another party. Items 16, 17 and 18 are only for use on projects for the U.S. Department of Housing and Urban Development (HUD).

As indicated below the following optional items are to be included in the ALTA / ACSM LAND TITLE SURVEY, except as otherwise negotiated:

1.  _X___  Monuments placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

2.  _X___  Vicinity map showing the property surveyed in reference to nearby highway(s) or major street intersection(s).

3.  _X___  Flood zone designation (with proper annotation based on federal Flood Insurance Rate Maps or the state or local equivalent, by scaled map location and graphic plotting only.)

4.  _X___  Gross land area (and other areas if specified by the client).

5.  ____  Contours and the datum of the elevations.

6.  _X___  List setback, height, and floor space area restrictions disclosed by applicable zoning or building codes (beyond those required under paragraph 5d of these standards). If none, so state. The source of such information must be disclosed. See "Note" above.

7.  _X___  (a) Exterior dimensions of all buildings at ground level

    (b) Square footage of:

    ____    (1) exterior footprint of all buildings at ground level;

    ____    (2) gross floor area of all buildings; or

    ____    (3) other areas to be defined by the client .

    ____    (c) Measured height of all buildings above grade at a defined location.



If no defined location is provided, the point of measurement shall be shown.

8. _x___ Substantial, visible improvements (in addition to buildings) such as billboards, signs, parking structures, swimming pools, etc.

9. ____ Parking areas and, if striped, the striping and the type (e.g. handicapped, motorcycle, regular, etc.) and number of parking spaces.

10. _x___ Indication of access to a public way on land such as curb cuts and driveways, and to and from waters adjoining the surveyed tract, such as boat slips, launches, piers and docks.

11. _x___ Location of utilities (representative examples of which are shown below) existing on or serving the surveyed property as determined by:

   __x__ (a) Observed evidence

   ____ (b) Observed evidence together with evidence from plans obtained from utility companies or provided by client, and markings by utility companies and other appropriate sources (with reference as to the source of information)

   •   Railroad tracks and sidings;
   •   Manholes, catch basins, valve vaults or other surface indications of subterranean uses;
   •   Wires and cables (including their function, if readily identifiable) crossing the surveyed premises, all poles on or within ten feet of the surveyed premises, and the dimensions of all cross members or overhangs affecting the surveyed premises; and
   •   Utility company installations on the surveyed premises.

12. ____ Governmental Agency survey-related requirements as specified by the client.

13. _x___ Names of adjoining owners of platted lands.

14. _x___ The distance to the nearest intersecting street as designated by the client.

15. ____ Rectified orthophotography, photogrammetric mapping, laser scanning and other similar products, tools or technologies may be utilized as the basis for the location of certain features (excluding boundaries) where ground measurements are not otherwise necessary to locate those features to an appropriate and acceptable accuracy relative to a nearby boundary.  The surveyor shall (a) discuss the ramifications of such methodologies (e.g. the potential accuracy and completeness of the data gathered thereby) with the title company, lender and client prior to the performance of the survey and, (b) place a note on the face of the survey explaining the source, date, relative accuracy and other relevant qualifications of any such data.

16. _x___ Observable evidence of earth moving work, building construction or building additions within recent months.

17. ____ Any changes in street right of way lines either completed or proposed, and available from the controlling jurisdiction; observable evidence of recent street or sidewalk construction or repairs.

18. _x___ Observable evidence of site use as a solid waste dump, sump or sanitary landfill.

19. Other:_____
located at the new Fowler Recreation Park in Forsyth County, GA.

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev 05.20.03



**Survey**    Construction Layout Staking of the Cinema Tract    **$20,000.00**

- LAI shall verify and set survey control. This control shall be utilized to set the temporary and permanent benchmarks for the layout and as-built surveys.
- Buildings and column lines will be staked by the contractor or their subcontractor.
- LAI shall provide layout and staking for the following items as taken from the design plan set for the Cinema Tract:
    - Utilities, Valves, and Storm and Sewer Structures
    - Parking, Rough Grade, Final Grade, and Slopes
    - Pond and Control Structure
    - Pipes and Culverts
    - Entrance and Construction Exit
    - Curbing
    - Building corner offsets.

**Survey**    As-Built Survey of the Cinema Site and Utilities    **$5,000.00**

- All above ground utilities will be located.
- These items will include water lines, storm and sewer for the Cinema Site.
- The survey will be provided on an appropriate sheet size and at a scale no larger than 1" = 60'.

1800 Parkway Place, Ste. 720  |  Marietta, Georgia 30067  |  tel. 770.423.0807  |  fax 770.423.1262

Rev. 05.20.08



# Additional Services

The following are services that are not included within this Scope of Work, but can be provided upon the client's request:

- Filing Fees for Permits & Approvals
- Additional Field Surveys
- Construction Admin Svc
- Site Lighting (Sub-Consultant Fee)
- Streetscape Plans & Permits
- Traffic and/or Signalization Studies
- Any FEMA Related Issues
- Stormwater Management Plans (Pond Design)
- Roadway Environmental Service
- Staging / Maintenance of Traffic Plans
- Soil Survey / Subsurface Investigation
- Coordination With Other Client Consultants
- Permitting Process In Excess of 6 Months
- Legal Descriptions and / or Platting of Utility Easements
- Architectural Detailing

- As-Built Surveys (Limited to $5,000.00)
- Utility Availability Letters
- Building Permitting
- Re-Zoning Plats
- Design of Retaining Walls & Structures
- On-Site and Downstream Hydrology Studies
- Sidewalk Improvements
- Roadway Traffic Assignment Diagrams
- Pavement Designs
- Stakeout Plan (Limited to $20,000.00)
- Geo-Technical and/or Environmental Studies
- Zoning or Design Variances and / or Associated Exhibits
- Roadway Improvement and / or GDOT Plans & Permits
- Major Structures Design (Bridges, Retaining Walls, Box Culverts)
- Outlot / Tenant Specific Coordination

**Plans are considered to be beyond conceptual layout once the plan set has reached 25% completion.**

**Any changes to the design layout at that point would require an additional service charge for reworking of the site design, based on the amount of changes (please refer to the attached sample 'Scope Clarification' form).**

Although not anticipated at this time, any work of this type will be performed per the Terms and Conditions and charged on an hourly basis.

1800 Parkway Place, Ste. 720 | Marietta, Georgia 30067 | tel.770.423.0807 | fax 770.423.1262

Rev 05.20.08



# Subconsultant(s)

LAI will solicit, review and advise the CLIENT on awarding all subconsultant(s) proposals per the following to ensure proper integration into the overall project design.  All subconsultant(s) contracts are to be executed by the CLIENT'S office.  If the CLIENT prefers LAI Engineering to retain subconsultant(s) directly, a 10% markup will be added to the subconsultant(s) fee to cover LAI Engineering's additional administrative expenses.

**Subconsultant(s)**    Irrigation Design Plan                                                    $8,000.00

- LAI will request an irrigation design plan from subconsultant for site specific landscaping plan layout, along with necessary details.

**Subconsultant(s)**    Site Lighting Plan                                                        $1,500.00

- Plan will include the layout of site lighting according to the supplier-furnished photometric design.

| Subconsultant(s) | | Design Fee |
|---|---|---|
| | Irrigation Design Plan | $8,000.00 |
| | Site Lighting Plan | $1,500.00 |
| Total | | $9,500.00 |

*The attached Terms and Conditions are made a part of this proposal and are integral to the administration of the contract. Reimbursable expenses will be in accordance with the enclosed Terms and Conditions.*

1800 Parkway Place, Ste. 720  |  Marietta, Georgia 30067  |  tel.770.423.0807  |  fax 770.423.1262

Rev.05.26.08



# Terms & Conditions

## I.  HOURLY RATE SCHEDULE

Services provided outside the contracted amount will be invoiced in accordance with the following rates:

| | | | |
|---|---|---|---|
| Principal | $150.00/Hour | Senior Project Manager | $125.00/Hour |
| Department Director | $140.00/Hour | Project Manager | $110.00/Hour |
| Registered Land Surveyor | $125.00/Hour | Landscape Architect | $95.00/Hour |
| Survey Construction Staking | $145.00/Hour | Project Engineer II | $95.00/Hour |
| Surveying (3-man crew) | $140.00/Hour | Project Engineer I | $85.00/Hour |
| Surveying (GPS crew) | $145.00/Hour | CADD Designer | $80.00/Hour |
| Surveying (2-man crew) | $135.00/Hour | CADD Operator | $70.00/Hour |
| Survey Senior Project Manager | $110.00/Hour | Survey Field Tech | $75.00/Hour |
| Survey Project Manager | $90.00/Hour | Project Coordinator | $80.00/Hour |
| 3D Laser Scanning | $145.00/Hour | Permit Coordinator | $80.00/Hour |
| Senior Surveyor Tech | $80.00/Hour | Clerical | $55.00/Hour |

## II.  BASIS OF PAYMENTS

**A.**     **Monthly Invoices.** Payments for Basic Services shall be billed on a monthly basis for work performed to date and shall be in proportion to services performed.  Included in this billing shall be any charges for Reimbursable Expenses as defined below.

**B.**     **Reimbursable expenses.** Reimbursable expenses include actual expenditures plus 10% made by LAI in the interest of the Project.  These expenses may include any of the following:

1. Printing and plotting fees paid for securing permits, licenses and other approval of authorities having jurisdiction over the Project,
2. Out-of-pocket expenses including, but not limited to, travel expenses (air fare, lodging, meals, etc.), and job-related mileage. Invoice cost of automobile mileage shall be a charge at the rate of one and one-half percent (1.5%) per month and in addition, LAI may, after giving seven days notice to the CLIENT, suspend services under this Agreement until LAI has been paid in full all amounts due LAI for services and expenses.

**C.**     **Time of payment.** LAI shall submit monthly invoices for Basic and Additional Services rendered and for reimbursable expenses incurred.  The CLIENT shall pay LAI within thirty (30) calendar days after receipt of the associated invoice.

**D.**     If the CLIENT fails to make any payment due LAI for services and expenses within thirty (30) calendar days after receipt of LAI invoice the amounts due LAI shall include a charge at the rate of one and one-half percent (1.5%) per month and in addition, LAI may, after giving seven days notice to the CLIENT, suspend services under this Agreement until LAI has been paid in full all amounts due LAI for services and expenses.

**E.**     Should it be necessary to collect this account through an attorney, the CLIENT agrees to pay all costs of collection, including all reasonable attorney's fees and fees for trials or appeals.

**F.**     The CLIENT'S obligation to pay under this Agreement is in no way dependent upon the CLIENT'S ability to obtain financing, payment from third parties, approval of governmental or regulatory agencies, or the financial viability of the project.

**G.**     **Payment during disputes.** LAI shall continue to perform its obligations under this Agreement pending resolution of any dispute and CLIENT shall continue to make payments for all amounts due LAI for its continued performance.  CLIENT'S right to withhold payments shall be limited only to that portion of a billing relating to the services that are in dispute.

**H.**     **Termination of contract by client.** CLIENT may terminate this Agreement with seven days prior notice to LAI for convenience or cause.  CLIENT shall pay LAI for all services rendered and all costs incurred up to the date of termination in accordance with the payment provisions set forth herein.  In addition, CLIENT shall reimburse LAI for all expense reasonably incurred in connection with the termination of this Agreement for convenience.  Upon the termination for convenience and payment of all sums due LAI, documents prepared by LAI pursuant to this Agreement shall become the property of CLIENT on the condition that CLIENT agrees to hold harmless, indemnify and defend LAI from and against any and all claims, liabilities, losses, damages, and costs including but not

Page 17 of 18
October 19, 2009



limited to costs of defense, arising out of the modification, misinterpretation, or misuse of the documents in the completion of the project or for medication to the project, excepting only those liabilities, losses, damages, and costs caused by the sole negligence of LAI.

I.        Termination of contract by LAI. LAI may terminate this Agreement for cause with seven days prior written notice to CLIENT. Failure of CLIENT to make payments when due shall be cause for suspension of services or, ultimately, termination, unless and until LAI has been paid in full all amounts due for services, expenses and other related charges.

## III.  STANDARD PROVISIONS

A.        Limitation of liability. CLIENT agrees, to the fullest extent permitted by law, to limit the liability of LAI and its subconsultants to the CLIENT for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorney's fees and costs and expert witness fees and costs, so that the total aggregate liability to LAI and its subconsultants to all those named shall not exceed $100,000, or LAI total fee for services rendered on this project, whichever is lesser. It is intended that this limitation apply to any and all liability or cause of action however alleged or arising, unless otherwise prohibited by law.

B.        Notification of defects. In order to mitigate losses from any claimed deficiency in the service(s) rendered by LAI, notification must be promptly given of such claimed deficiencies.

C.        Miscellaneous provisions.

1.        This Agreement shall be governed by the laws of the State of Georgia.

2.        This Agreement represents the entire integrated agreement between CLIENT and LAI and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the CLIENT and LAI.

3.        Annual rate adjustments may be made.

D.        Construction phase service. If this Agreement provides for any construction phase services by LAI, it is understood that the Contractor, not LAI, is responsible for the construction of the project, and that LAI is not responsible for the acts or omissions of any contractor, subcontractor or material supplier, for safety precautions, programs or enforcement; or for construction means, methods, techniques, sequences and procedures employed by the Contractor.

E.        Dispute Resolution. CLIENT and LAI agree that they shall first submit any and all unsettled claims, counterclaims, disputes and other matters in question between them arising out of or relating to this Agreement to mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association, effective as of the date of this Agreement.

F.        Force Majeure. Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in the performance of its obligations results

from any cause beyond its reasonable control and without its negligence.

G.        Hazardous Environmental Conditions. It is acknowledged by both parties that LAI's scope of services does not include any services related to the presence at the site of asbestos, PCBs, petroleum, hazardous waste or radioactive materials. CLIENT acknowledges that LAI is performing professional services for CLIENT and LAI is not and shall not be required to become an "arranger," "operator," "generator" or "transporter" of hazardous substances, as defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1990 (CERCLA).

H.        Indemnity. CLIENT and LAI each agree to indemnify and hold the other harmless, and their respective officers, employees, agents and representatives, from and against liability for all claims, losses, damages, expenses and costs for injury to persons or damage to property, including reasonable attorney's fees, but only to the extent such claims, losses, damages, or expenses are caused by the indemnifying party's negligent acts, errors or omissions. In the event claims, losses, damages or expenses are caused by the joint or concurrent negligence of CLIENT and LAI, they shall be borne by each party in proportion to its negligence. In no event shall LAI have any duty to indemnify or hold harmless CLIENT, its contractors or subcontractors, or their respective agents, representatives, sureties and employees from and against any claims, losses, damages, expenses or costs arising out of or related to their own negligence.

I.        Options of cost. When included in LAI'S scope of services, opinions or estimates of probable construction cost are prepared on the basis of LAI'S experience and qualifications and represent LAI'S judgment as a professional generally familiar with the industry. However, since Consultant has no control over the cost of labor, materials, equipment or services furnished by others, over contractor's methods of determining prices, or over competitive bidding or market conditions, LAI cannot and does not guarantee that proposals, bids, or the actual construction cost will not vary from LAI'S opinions or estimates of probable construction cost.

J.        Standards of care. The standard of care for all professional services performed or furnished by LAI under this Agreement will be the skill and care ordinarily employed by civil engineers and/or surveyors in the performance of similar duties under similar conditions and like surrounding circumstances. LAI acknowledges that time of performance is important to CLIENT and agrees to exert reasonable efforts to provide the services required hereunder in a manner consistent with that schedule. CLIENT acknowledges that the timing of LAI'S performance must be governed by sound professional practices and agrees that LAI shall no be liable for delay or damages arising out of LAI'S exercise of that time for performance which LAI deems in its sole judgment as necessary for the exercise of usual and customary professional care.

K.        Disclaimer of warranties. LAI shall exercise



usual and customary professional care in its efforts to comply with all applicable codes, regulations and laws in effect as the date of this Agreement. LAI does not warrant or guarantee any particular result from its services under this Agreement. LAI specifically disclaims any warranties, express or implied, which may arise by statute, common law, or equity including without limitation that work or professional services will be performed in a good workmanlike manner, or any express warranty written or oral, regarding either its services or the suitability thereof for any purpose. In the performance of services under this Agreement, or the resolution of any dispute hereunder, LAI shall not be required to issue any certification, warranty or guarantee that LAI, in its sole discretion, determines may increase LAI'S risk or otherwise impair or eliminate coverage under LAI'S professional or general liability insurance.

L.     LAI as additional insured. CLIENT agrees to require its Contractor to name LAI and its agents and subconsultants as Additional Insured on Contractor's policy or policies of comprehensive or commercial general liability insurance [USING ISO ADDITIONAL INSURED ENDORSEMENT CG 20 10 07 04 AND CG 20 37 10 01] provided coverage to the additional insured when the claim is caused in whole or in part by the acts or omissions of the named insured including coverage for products, completed operations contractual liability. Said coverage shall apply as primary and non-contributing before any other insurance or self-insurance maintained by LAI, including any deductible.

M.     No third party beneficiaries. Nothing herein is intended or otherwise shall be interpreted to create a contractual relationship with or a cause of action in favor of any third party against either CLIENT or LAI. The professional services performed hereunder are intended for the sole and exclusive benefit of the CLIENT and not for any other person or entity.  Only the CLIENT shall have the right to rely upon any information prepared as part of the professional services rendered hereunder. No person or entity other than the CLIENT shall have any claim against LAI because of this Agreement or the performance or nonperformance of services hereunder. In order to carry out the intent of this provision, CLIENT shall include a disclaimer or otherwise include a provision in all contracts with contractors and/or other entities whenever CLIENT discloses or otherwise uses information and/or the professional services required hereunder as part of any project in which any one or more of them may be involved.

N.     Review of contractor submittals and shop drawings.  LAI shall review only those shop drawings, product data, samples and other submittals as are required by the Scope of Work.  Such review shall be only for general conformance with the design concept and general compliance with the information given in the design documents.  It shall not include review of quantities, dimensions, weights or gauges, fabrication processes, construction methods, coordination of the work with other trades, or construction safety precautions, all of which are the sole responsibility of the Contractor.  Such review shall not authorize any deviations from the design documents

which have not been clearly noted.  CLIENT shall ensure its contractors are required to make submittals in a time and in a manner sufficient to allow LAI to review same with reasonable promptness consistent with sound professional practice so as not to cause a delay in the CLIENT'S schedule but in no event so that at least [SEVEN (7)] days from the date of receipt are allowed for review for routine work.  For work of more complexity, the time for review will be increased in proportion to the complexity of the work. Client shall ensure its contractors are required to make such submittals in a manner and condition so as to facilitate expeditious and complete review.  Voluminous submittals at one time are discouraged and may result in increased review time.  Client shall ensure that prior to making a submittal, its contractors have verified the work requirements, field conditions, dimensions and measurements, construction criteria, sequence or assembly or construction, access and clearances, the requirements of all other sections or trades whose work is related thereto, catalog numbers and any other data as required for a proper and complete installation of the work.

## IV.     DOCUMENTATION AND WORK PRODUCTS

A.     Ownership and copyright of documents. All documents prepared or furnished by LAI pursuant to this Agreement are instruments of LAI'S professional service, and LAI shall retain an ownership and property interest therein, including all copyrights. LAI grants CLIENT a license to use instruments of LAI'S professional service for the purpose of constructing, occupying or maintaining the project. Reuse or modification of any such documents by CLIENT, without LAI'S written permission, shall be at CLIENT'S sole risk, and CLIENT agrees to indemnify and hold LAI harmless from all claims, damages and expenses, including attorneys' fees, arising out of such reuse by CLIENT or by others acting through CLIENT.

B.     Use of electronic media. Copies of documents that may be relied upon by CLIENT are limited to the printed copies (also known as hard copies) that are signed or sealed by LAI. Files in electronic formats, or other types of information furnished by LAI to CLIENT such as text, data or graphics, are only for convenience of CLIENT. Any conclusion or information obtained or derived from such electronic files will be at the user's sole risk. When transferring documents in electronic formats, LAI makes no representations as to long-term compatibility, usability, or readability of documents resulting from the use of software application packages, operating systems or computer hardware.

## EXHIBIT "D"

### SITE DESIGN SERVICES OBJECTION NOTICE PROCEDURES

(i)      Seller and Purchaser shall direct Agent to disburse any portion of the proposed disbursement as to which no objection is made. For example only, if Seller requests in a Disbursement Notice that $50,000 be disbursed to it pursuant to this Agreement, but Purchaser claims in an Objection Notice that Seller is only entitled to $40,000, then Seller and Purchaser shall direct Agent to disburse $40,000 to Seller, and the remaining $10,000 shall be the subject of the dispute resolution procedure set forth below.

(ii)      During the period commencing on the date of the Seller's receipt of the Objection Notice and continuing through the fifth (5th) day thereafter, Purchaser and Seller shall exchange relevant information regarding the matters at issue in the Objection Notice. If prior to or upon the conclusion of such 5-day period, Purchaser and Seller agree in writing that some or all of the Earnest Money should be disbursed, Purchaser and Seller shall promptly deliver a copy of such writing to Agent and Agent shall promptly disburse to Seller the amount of such agreed upon Earnest Money, without prejudice to the rights of either Seller or Purchaser as to the remaining Earnest Money (if any).

(iii)      If Purchaser and Seller have not mutually and consensually resolved Purchaser's objection set forth in the Objection Notice by the conclusion of the 5-day period described above in clause (ii), either Purchaser or Seller may submit the matter for decision to the American Arbitration Association ("**AAA**") in Atlanta, Georgia in accordance with the arbitration rules of the AAA, and the decision of the arbitrator appointed by the AAA shall be final, binding and conclusive on each of the parties hereto. If permitted under the rules of the AAA, the arbitration proceeding shall be conducted within sixty (60) days after the date of submittal to the AAA. The arbitrator selected by the AAA shall be a single arbitrator who is familiar with commercial real estate investment.

(iv)      The non-prevailing party in the arbitration shall pay (A) all fees and expenses of the arbitration, (B) the prevailing party's reasonable attorneys' fees and costs and expenses incurred in such arbitration and (C) simple interest on the amount of the distribution at issue at the rate of eighteen percent (18%) per annum from the date of the Disbursement Notice to the date that such disputed amount is paid to the prevailing party.

## EXHIBIT "E"

**INTENTIONALLY DELETED.**

## EXHIBIT "F"

### CONSTRUCTION SCHEDULE

[TO BE INSERTED BY AMENDMENT]

## EXHIBIT "G"

### DRAW SCHEDULE

[TO BE INSERTED BY AMENDMENT]

## CERTIFICATE OF SERVICE

This is to certify that the undersigned served a copy of the Debtors' Motion for Order Approving Sale of Real Property through the electronic case filing system (ECF) or by placing a copy of the same in the United States Mail, with sufficient postage thereon to ensure delivery upon the following parties:

John A. Thomson, Jr., Esq.
Womble Carlyle Sandridge & Rice, PLLC
271 17th Street, N.W.
Suite 2400
Atlanta, GA 30363

David V. Levy, Esq.
Levy & Zeewy, LLC
1862 Independence Sq.
Suite D
Atlanta, Georgia 30338-5136

Albert F. Nasuti, Esq.
Thompson, O'Brien, Kemp & Nasuti, P.C.
40 Technology Parkway South
Suite 300
Norcross, Georgia 30092

Jeffrey W. Kelley, Esq.
Garrett Nail, Esq.
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308-2216

Alisa H. Aczel, Esq.
Troutman Sanders LLP
Bank of America Plaza, Suite 5200
600 Peachtree Street N.E.
Atlanta, Georgia 30308-2216

Catherine Harrison King, Esq.
Miller & Martin PLLC
Suite 800
1170 Peachtree Street NE
Atlanta, Georgia 30309-7649

R. Brian Wooldridge, Esq.
Mann & Wooldridge, P.C.
P.O. Box 310
Newnan, Georgia 30264-0310

Bright-Meyers 2001 LLC
c/o Shelley D. Rucker
Miller & Martin PLLC
Suite 1000, Volunteer Building
832 Georgia Avenue
Chattanooga, TN  37402-2289

Office of the United States Trustee
3rd Floor
Richard B. Russell Federal Building
75 Spring Street
Atlanta, Georgia 30303

George C. Rosenzweig, Esq.
Rosenzweig, Jones Horne & Griffis,
P.C.
32 South Court Square
Post Office Box 220
Newnan, GA  30264

Aliance Entertainment, Inc.
c/o The Bloom Law Firm, LLP
Attention: Simon H. Bloom
100 Peachtree Street, N.E.
Suite 2140
Atlanta, GA 30303

Kenneth H. Kraft, Esq.
Parker, Hudson, Rainer & Dobbs LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue N.E.
Atlanta, Georgia 30303


This 28th day of January, 2010.

\s\ John A. Christy
John A. Christy

SCHREEDER, WHEELER & FLINT, LLP.
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
404-681-3450